# ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Gemma Moore

628 Osborn Street

Brooklyn, N.Y 11212

NAME OF PLAINTIFF(S)

2011 JUL 20  PM 9:49

# CV11-3552

**COMPLAINT**

Jury Trial Demanded

v.

Kingsbrook Jewish Medical Center

585 Schenectady Avenue

Brooklyn, N.Y 11203

NAME OF DEFENDANT(S)

MATSUMOTO, J.

J. ORENSTEIN, M.J.

This action is brought for discrimination in employment pursuant to (check only those that apply):

[✓]   Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) (race, color, gender, religion, national origin).
**NOTE:** *In order to bring a suit in federal district court under Title VII, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

[ ]   Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634 (amended in 1984, 1990, and by the Age Discrimination in Employment Amendments of 1986, Pub. L. No. 92-592 , the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring a suit in federal district court under the Age Discrimination in Employment Act, you must first file charges with the Equal Employment Opportunity Commission.*

[ ]   Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117 (amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 and the Civil Rights Act of 1991, Pub. L. No. 102-166).
**NOTE:** *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a right to sue letter from the Equal Employment Opportunity Commission.*

-1-

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343.  Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law.

1.      Plaintiff resides at:



628 OSBORN STREET, BROOKLYN
_____
Street Address

KINGS, N.Y, 11212, 646 924 7554
_____
County     State     Zip Code     Telephone Number

2.      Defendant(s) resides at, or its business is located at:

585 SCHENECTADY AVENUE
_____
Street Address

KINGS, BROOKLYN, N.Y, 11203
_____
County     City     State     Zip Code

3.      The address at which I sought employment or was employed by the defendant(s) is:

585 SCHENECTADY AVENUE
_____
Street Address

KINGS, BROOKLYN, N.Y, 11203
_____
County     City     State     Zip Code

4.      The discriminatory conduct of which I complain in this action includes

(check only those that apply).

☐   Failure to hire.

☑   Termination of my employment.

☑   Failure to promote.

☐   Failure to accommodate my disability.

☐   Unequal terms and conditions of my employment.

☑   Retaliation

☐   Other acts (specify): _____

*NOTE: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

5.  It is my best recollection that the alleged discriminatory acts occurred on:
    08/2007, 9/2008, 10/2008, 7/2009
    Date(s)

6.  I believe that the defendant(s) (check one)

    ☐   is still committing these acts against me.

    ☑   is not still committing these acts against me.

7.  Defendant(s) discriminated against me based on my:
    (check only those that apply and state the basis for discrimination, for example, what is your religion, if religious discrimination is alleged)

    ☑   race African American      ☐   color _____

    ☐   gender/sex _____      ☐   religion _____

    ☑   national origin TRINIDAD + TOBAGO

    ☐   age _____   My date of birth is: _____
                                           Date

    ☐   disability _____

*NOTE: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

8.    The facts of my case are as follows:

① I was accused of hiring my sister as the Associate Director of nursing, investigated and humiliated. ② Harassed by Human Resources through the medium of the Corporate Compliance officer. ③ Christine Kay (white) not qualified to, but given authority by Mary Anne Rose (white), to send out memos to the nursing dept. ④ My son was terminated after I questioned about racism in the work place. ⑤ I was practically forced to resign after I spoke out against the unfair termination of an employee who I believe was being discriminated against.

See attached - Chronology of events & charge filed at the E.E.O.C.

(Attach additional sheets as necessary)

**Note:**    As additional support for your claim, you may attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights, or the New York City Commission on Human Rights.

9.    It is my best recollection that I filed a charge with the New York State Division of Human
Rights or the New York City Commission on Human Rights regarding defendant's

alleged discriminatory conduct on: _____.
                                        Date

10.   It is my best recollection that I filed a charge with the Equal Employment Opportunity

Commission regarding defendant's alleged discriminatory conduct on: May 11, 2010.
                                                                        Date

**Only litigants alleging age discrimination must answer Question #11.**

-4-

11.    Since filing my charge of age discrimination with the Equal Employment Opportunity

Commission regarding defendant's alleged discriminatory conduct (check one),

☐        60 days or more have elapsed.

☐        less than 60 days have elapsed.

12.    The Equal Employment Opportunity Commission (check one):

☐        has not issued a Right to Sue letter.

☑        has issued a Right to Sue letter, which I
**received** on _APRIL 25, 2011_ .
                            Date

**NOTE:**    Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity
Commission to this complaint.

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,
including injunctive orders, damages, costs, and attorney's fees.

_____
PLAINTIFF'S SIGNATURE

Dated:  _7/20/2011_

_628 OSBORN STREET_
Address
_BROOKLYN, N.Y 11212_
_646-924-7554_
Phone Number

-5-

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY  10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3620
General FAX: (212) 336-3625

Gemma Moore
723 Williams Street
Baldwin, NY 11510

RE:   Kingsbrook Jewish Medical Center
      Charge No: 520-2010-02287

Dear Ms. Moore:

The U.S. Equal Employment Opportunity Commission ("EEOC" or "Commission") enforces discrimination laws under Title VII of the Civil Rights Act of 1964 ("Title VII") which prohibits employment discrimination based on race, color, sex, religion, or national origin; the Equal Pay Act of 1963 ("EPA"), which protects men and women who perform substantially equal work in the same establishment from sex-based wage discrimination; the Age Discrimination in Employment Act of 1967 ("ADEA") which protects individuals who are 40 years of age or older; the Americans with Disabilities Act ("ADA"), which prohibits discrimination against qualified individuals with disabilities and the Genetic Information Nondiscrimination Act of 2008 ("GINA").

The EEOC has Charge of Discrimination ("Charge") prioritization procedures and these procedures call for the Commission to focus its limited resources on those cases that are most likely to result in findings of violations of the laws that we enforce. In accordance with these procedures the Commission has evaluated your Charge as well as Respondent's position statement and, based upon the information you have submitted, the EEOC has decided not to further pursue its investigation of this Charge.

You allege that you were terminated because of racism (African American), national origin (Tobago) and in retaliation for opposing discrimination against other employees. You claim other Caucasian employees received promotions into positions for which you believe you were more eligible. You claim that you were denied tuition reimbursement for coursework you were completing at a university because of your race. You were offered a severance package in the fall of 2009 and after refusing to sign the package, you allege you were constructively terminated. You also claim your son was terminated in retaliation for your opposition of discrimination in the workplace.

Respondent claims that 70% of Kingsbrook's employees are African-American and senior manager positions are held by minorities, including African-Americans. Respondent refutes each allegation of failure to promote you, alleging that either you never applied for cited positions,

that one of the positions cited was at a significantly lower pay level than your current one and another, for which you were not qualified, was given to a Filipino woman and not a Caucasian.

Respondent provided evidence that you were reimbursed for tuition in 2006 and 2007 and states you may have reached the maximum amount that you were entitled to.  Although you did not accept the severance package, Respondent alleges you were never disciplined, demoted or told that you would be terminated. Respondent submits a letter you provided in November of 2009 resigning voluntarily, describing a positive work environment and no mention of discrimination.

You have not provided sufficient evidence to conclude you were discriminated or retaliated against.  In addition, there is no evidence that you complained of discrimination until after you resigned.  In fact, your resignation letter signed by you in December 2009 describes a positive work environment, contradicting your allegations of discrimination and that you were constructively terminated.   [DECEMBER OR NOVEMBER?  SEE ABOVE]

Even though you may disagree with this determination, it is very unlikely that EEOC would find a violation if it invested additional resources.

Your Determination/Notice of Right to Sue is enclosed. This Determination is final.  If you wish to pursue this matter, you may file a lawsuit on your own in Federal District Court using the enclosed Notice of Right to Sue, within **90 days** of your receipt of it.  Once this 90 day period is over, unless you have filed a lawsuit, you will have lost your right to sue.

If you have any questions, please call Electra Yourke at (212) 336-3751.

Sincerely,

_(signature)_                           for Kevin Berry
                                        District Director

**APR 2 2 2011**
_____
DATE

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:
**Gemma Moore**
**723 William Street**
**Baldwin, NY 11510**

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2010-02287** | **Electra Yourke,**<br>**Enforcement Manager** | **(212) 336-3751** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐    Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kevin Berry*

**Kevin J. Berry,**
**District Director**

APR 2 2 2011
*(Date Mailed)*

Enclosures(s)

cc:    **KINGSBROOK JEWISH MEDICAL CENTER,**
**RUTLAND NURSING HOME**
**c/o Barbara E. Hoey**
**Littler Mendelson P.C.**
**900 Third Avenue**
**New York, NY 10022**

**Michael J. Borrelli**
**Borrelli & Associates P.L.L.C.**
**One Old Country Road, Suite 347**
**Carle Place, NY 11514**

# Information Related to Filing Suit
## Under the Laws Enforced by the EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**Private Suit Rights** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**Private Suit Rights** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**Attorney Representation** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**Attorney Referral and EEOC Assistance** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

## Representing Yourself in Federal Court *(Pro Se)*

## Welcome to *Pro Se!*

The *pro se* information on the Court''s website is specifically for individuals who are representing themselves in the Southern District of New York without the assistance of an attorney. It is intended as an informative and practical resource for *pro se* litigants, and is not a substitute for legal advice from an experienced attorney. The information is procedural in nature and should be read in conjunction with the Federal Rules of Civil Procedure, the Local Rules of this Court and the Individual Practices of the judge assigned to your case. In addition, the links we give to other websites are for information purposes only, and neither the *Pro se* Office nor the United States District Court for the Southern District of New York is responsible for the accuracy of the information contained in other websites.

## What does it mean to appear *pro se*?

Although the majority of individuals, also known as "litigants" or "parties", appearing before this court, is represented by attorneys, a small percentage appears *pro se*. Litigants or parties representing themselves in court without the assistance of an attorney are known as *pro se* litigants. "*Pro se*" is Latin for "in one''s own behalf."

The right to appear *pro se* in a civil case in federal court is contained in a statute 28 U.S.C. §§ 1654. Thus, anyone can appear *pro se,* and anyone who appears before the Court without an attorney is considered *pro se*. However, there are certain limitations to self-representation, such as:

- Corporations and partnerships must be represented by counsel. Parties planning to begin or defend an action on behalf of a corporation or partnership may not appear *pro se* in the Southern District of New York, and must be represented by an attorney.

- Similarly, a *pro se* litigant may not act as a class representative in a class action. Therefore a *pro se* litigant may not bring a class action.

- Furthermore, a non-attorney parent may not appear *pro se* on behalf of a child, except to appeal the denial of social security benefits to such child.

500 Pearl Street, New York, New York 10007-1312 - 300 Quarropas Street, White Plains, NY 10610-4150

# FACTS ABOUT FILING
# AN EMPLOYMENT DISCRIMINATION SUIT
# IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission.  This ends our handling of your charge.  The Commission's action is effective upon receipt.  Now, you must decide whether you want to file a private lawsuit in court.  This fact sheet answers several commonly asked questions about filing a private lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit.  You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge.  The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred.  New York State has four federal districts:

- The **United States District Court for the Southern District of New York** is located at 500 Pearl Street in Manhattan.  It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester.

- The **United States District Court for the Eastern District of New York** is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk.

- The **United States District Court for the Western District of New York** is located at 68 Court Street in Buffalo.  It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates.

- The **United States District Court for the Northern District of New York** is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneinda, Onandaga, Oswego, Otsego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington.  This District Court's *pro Se* Attorney has offices at 10 Broad Street in Utica New York.

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit **must** be filed in U.S. District Court within __90 days__ of the date you receive the enclosed final action.  Once this 90 day period is over, unless you have filed suit, you will have lost your right to sue.

(Over)

## DO I NEED A LAWYER?

No, you do not need a lawyer to file a private suit. You may file a complaint in federal court without a lawyer which is called a *pro se* complaint. Every district court has either a clerk or staff attorney who can assist you in filing *pro se*. To find out how to file a *pro se* complaint, contact the clerk of the court having jurisdiction over your case who can advise you of the appropriate person to assist you and of the procedures to follow, which may vary from district to district.

You may, however, wish to retain a lawyer in order to adequately protect your legal rights. Whether you retain a private attorney, or file *pro se*, you must file your suit in the appropriate court within 90 days of receiving this mailing.

## WHAT IF I WANT A LAWYER BUT I CAN'T AFFORD ONE?

If you can't afford a lawyer, the U.S. District Court which has jurisdiction may assist you in obtaining a lawyer. You must file papers with the court requesting the appointment of counsel. You should consult with the office of the district court that assists *pro se* complainants for specific instructions on how to seek counsel. The appointment of counsel in any *pro se* complaint is always at the discretion of the court.

Generally, the U.S. District Court charges a $250.00 filing fee to commence a lawsuit. However, the court may waive the filing fee if you cannot afford to pay it. You should ask the office of the District Court that assists *pro se* complainants for information concerning the necessary procedure to request that the filing fee be waived.

## HOW CAN I FIND A LAWYER?

These are several attorney referral services operated by bar or other attorney organizations which may be of assistance to you in finding a lawyer to assist you in ascertaining and asserting your legal rights:

American Bar Association          New York State Bar Association
(312) 988-5522                   (800) 342-3661

National Employment Lawyers Association Referral Service
(212) 819-9450

Your County, City, or Municipal Lawyers or Bar Association may also be of assistance.

## HOW LONG WILL THE EEOC RETAIN MY CASE FILE?

Generally, the Commission's rules call for your charge file to be destroyed after 2 years from the date of a no cause determination or six months after other types of final actions. If you file suit, and wish us to retain your file for more than the normal retention period, you or your attorney should forward a copy of your court complaint to this office within 10 days after you file suit. **If You File Suit, You or Your Attorney Should Also Notify this Office When the Lawsuit is Resolved.**

# GEMMA MOORE

## <u>CHRONOLOGY OF EVENTS</u>

| | |
|---|---|
| 2/13/2003 | I was hired by Kingsbrook Jewish Medical Center as the Director of Nursing Services (DNS) for Rutland Nursing Home (RNH) at an annual salary of $105,000. |
| Early 2004 | I received first annual performance review which had excellent ratings. |
| Mid 2005 | I was promised a retention bonus of $8,000 to be paid the next year if I remained with the organization. |
| August 2006 | I received the retention bonus in the amount of $8,000. |
| Late 2006 | I received 3% salary increase.  (Standard for entire organization) |
| Early 2007 | I had to walk out of a meeting that was organized by HR and the 1199 SEIU union, because the meeting was directed in such a manner that I was literally cursed at by the VP of that union **(White)**, in front of all the union delegates and John McKeon, the VP of Human Resources **(White),** who did nothing to protect me from her barrage and onslaught of words.  One of her quotes that will forever remain in my mind is "Who the hell do you think you are".  Seeing that I was set up and alone in that meeting, I had to excuse myself and leave the meeting.  Mr. McKeon was not thrilled with the fact that I had left the meeting and made his displeasure known by referring to my action in a subsequent meeting with the RNH Administrative team. |
| Mid 2007 | I was accused by the Human Resources Department of hiring my sister as the Associate DNS and was investigated by John McKeon, VP HR **(White).** The allegation was not substantiated, and Kathleen John **(Black)** was immediately accused of double dipping.  This accusation was also unsubstantiated.  Top security personnel, Richard Perkins **(Black)**, tried to get me to convince Kathleen into resigning or face persecution by the Federal Government. |
| August 29, 2007 | I received a letter from Bonita Hardwick, Esq., Compliance Officer **(Black)** accusing me of not answering the Conflict of Interest Questionnaire truthfully as per the Human Resources Department. (Letter submitted) |

| | |
|---|---|
| August 29, 2007 | Wrote letter to Mary Anne Rose **(White)**, informing her of my feeling regarding the security of my job and of those persons close to me, also informing her that I felt I was being selected for discrimination and victimization. (Letter submitted) |
| 11/5/2007 | Disagreed with Mary Anne Rose, VP LTC **(White)** regarding issue of KRONOS training between Christine Kay, **(White)** and Jillian John **(Black)**. At this time Mary Anne Rose informed me that she would not endorse Jillian John for the staffing manager's position even though she had been doing the job single handedly for the past several months. |
| 11/2007 | I received 3% salary increase. (Standard for entire organization) |
| 3/2008 | Posting for the Staffing Managers position included a bachelor's degree which I questioned with both Mary Anne Rose **(White)** and John McKeon **(White)**. I spoke with John McKeon in his office and he informed me at that time that he had no problem with giving Jillian John the position, but Mary Anne was opposed to it. Please note that Jillian John's predecessor did not have a bachelor's degree. |
| 9/11/2008 | An email was sent to Ms. Kathleen John, Associate Director of Nursing **(Black)**, Ms. Mary Anne Rose, VPLTC **(White)**, Ms. Jillian John, Staffing Manager **(Black)** and myself **(Black)** by Ms. Christine Kay **(White)** informing us that an issue was discussed in the payroll committee meeting regarding enforcing the **option of the Department Head** requesting MD notes for employees calling out sick the day before, on or after a holiday. As per the email Ms. Kay stated that the issue was in the Acute Care and suggested that since it will probably spill over to LTC, she would like to send out a memo regarding enforcing the requirement of the sick note. Ms. Kathleen John in my absence responded to Ms. Kay's email telling her that a memo of that sort should come from me as the Director of Nursing. Ms. Kay's response was that since she is the Director of Long Term Care Resources she would send out the memo, implying in her email that directing the nursing staff to supply a medical note for sick calls the day before, on or after a holiday fell within her role as the Director of Long Term Care Resources. When I returned to work and saw the emails, I responded to Ms. Kay letting her know of my displeasure with her sending memos to the nursing staff and reiterating my role as the Director of Nursing. I also informed her that I would be sending out the memo. I proceeded to send out the memo to the nursing staff addressing the issue of sick calls surrounding the holidays and the requirement to provide MD notes. (E-mails submitted) |

| | |
|---|---|
| 9/24-25, 2008 | Ms Kay proceeded to send out another memo to all Rutland Nursing Home staff, copied to the Department Heads.  The tone of the memo was very demanding and intimidating stating that the employees will not be paid and will receive disciplinary action if they did not adhere to the instructions in the memo. (Memo submitted) |
| 10/16/2008 | I wrote a letter to Mr. John McKeon, VP HR **(White)** apprising him of the situation between Christine Kay, Mary Anne Rose and I but nothing was done to resolve the issue. (Letter submitted) |
| 11/2008 | I received 3% salary increase. (Standard for entire organization). |
| 2/2009 | Met with Mary Anne Rose **(White)** regarding my nursing goals for 2009. At that time I informed her that I did not want to go through what I went through in 2008 in regards to Christine Kay and her usurping of authority over my department.  I also informed her verbally that my intention was to remain working at Kingsbrook Jewish Medical Center for as long as possible. (Nursing goals submitted) |
| 3/2009 | In-serviced on discrimination organized by John McKeon **(White)**.  At the end of the in-service I questioned the fact that if only one race of people within an organization is being promoted to AVP and VP and there are people of other color more qualified than they and are not given the opportunity for promotions, if that was not a form of discrimination.  The lawyer **(white)** then asked me if I were speaking about this organization and I told him I was asking a general question.   Human Resources personnel, Earnest Liggins **(Black)** was within ear shot of the conversation. |
| 5/2009 | My son, Kyron Moore, **(Black)** who works at one of the offsite clinics was terminated for no apparent or stated reason.  He had never received any form of discipline in the past. |
| 7/30/2009 | Mary Anne Rose **(White)** informed me that she had some information to give to me that she knew would upset me.  She continued to say that Jillian John would be terminated because she was engaged in running a Susu and that I should speak to John McKeon about it. |
| 7/31/2009 | I went to see Mr. McKeon about the issue and he told me that he had information that Jillian John was running a Susu and that he could not tolerate this type of behavior from a manager.  He stated that he did not want to terminate her, but that I should speak to her about resigning.  I informed Jillian John of Mr. McKeon's request for her resignation and she |

was so distraught that she had to be taken to the Kings County Hospital emergency room.

8/3/2009    I was off duty, but as usual, I was reading my e-mails from work when I received an e-mail from Jillian John, addressed to Dr. Brady, President **(White)**, Kevin Molloy, COO **(White)**, John McKeon, **(White)**, Mary Anne Rose, **(White)** and Stacey Mohammed-Oliver, Human Relations Officer, **(Black)**, informing us that she reported to work and found out that she was replaced by the Staffing Associate who works the 3-11 shift, under the directive of Christine Kay **(White)**. I received a call from Mary Anne Rose **(White)** later on that morning, informing me that she authorized Christine Kay to replace Jillian.

8/3/2009    Received a letter via e-mail from HR signed by Mr. McKeon regarding Jillian John's suspension.

8/12 /2009  I attended a meeting with Jillian John and Mr. McKeon **(White)**, witnessed by Stacey Mohammed-Oliver **(Black)**. At that meeting Mr. McKeon told Jillian that he could not condone her behavior; he stated that maybe if she was a manager working in the radiology department for example, it would have been different. It was at this meeting that he informed her that she was suspended without pay.

On or around 8/21/09 John McKeon **(White)** and Mary Anne Rose **(White)** met with me regarding the meeting with Jillian John the week before. Mr. McKeon told me that he was displeased with my conduct at the meeting he had with Jillian John last week. He also asked me, "Why are you taking this stand, is it because you are involved? At this point I was fed up with the accusations and investigations against myself, so I told him, that if he wanted me to answer his questions he needed to charge me and then I would do so in the presence of my attorney. It was at this meeting I told him that I felt that everything that was happening was not just because of the Susu, but that it went deeper than that. Mary Anne Rose got very upset and told me that she could not believe that I thought she was involved in a conspiracy against Jillian and me, because there could be no conspiracy without her involvement. The meeting ended on that tone.

8/26/2009   Mary Anne Rose came to my office and told me that she could no longer work with me. She stated that our personal and working relationship is now tainted and that "the egg is broken". She continued to state, "As per John, Humpty Dumpty cannot be put back together again". At this time I explained to Mary Anne my point of view on everything that has been

happening to me from 2007. I reminded her about the unfounded accusation made against Kathleen and me about our relationship and the investigation we had to endure; I reminded her about the letter I got from the Compliance officer in 2007; I reminded her of the issue between Christine and me and how the whole matter was ignored. I informed her of the question I asked the lawyer after the discrimination in-service in May and the presence of Earnest Liggins, HR Personnel **(Black)** at that encounter and how my son was terminated less than two months after that. She stated that I did have some valid issues, and she would speak to Mr. McKeon about them. About ten minutes after that conversation, Mary Anne told me that we had to go and see Mr. McKeon in his office. At that meeting, I was informed by Mr. McKeon and Mary Anne Rose that I could no longer work at Kingsbrook. They wanted me to leave, but they wanted me to wait until the Department of Health (DOH) did their annual survey which was due sometime in October/November. I told them that I would not voluntarily leave a facility on the verge of a DOH visit, so the decision was up to them. Mr. McKeon asked me if I was willing to sign to that and I told him yes.

9/9/2009          Mary Anne Rose told me that we had a meeting with Mr. McKeon in his office. When we arrived at his office, Mr. McKeon gave me a document and told me to review it, since this was the document that I needed to sign as we had discussed in the previous meeting. I was given a few minutes alone to review the document. The document was a contract drawn up between Kingsbrook Jewish Medical Center and Gemma Moore, stating that I resign as of September 30, 2009, but that I would continue to function as the Director of Nursing until the DOH survey, but not later than December 31, 2009. The document also stated that I, nor my heirs, nor any relatives could apply or accept an offer to work at Kingsbrook or any of its affiliates in the future. The document also offered me four weeks' severance pay. I informed Mr. McKeon that I would not be signing that document because I was not voluntarily resigning my position. Mr. McKeon got visibly upset and then started threatening me with termination. He stated that he was going to terminate me at the last meeting we had, but he was only giving me the courtesy of resigning. I asked him what I was being terminated for and he told me because I did not conduct myself as a top level manager when he met with Jillian John on August 12, 2009. Mr. McKeon told me that he would get back to me in 2-3 days.

| 10/14/2009 | At 2:45 pm, Mary Anne Rose informed me that we had to meet with Mr. Kevin Molloy, COO **(White)** at 3:30 PM.  At this meeting Mr. Molloy told me that he is sure that I have heard of all the accusations, but even though they are not substantiated, I would still not be able to continue working in the organization.  With that, he gave me another contract to sign, and informed me that he needed a response within three weeks. |
| 10/15/2009 | Contract given to my lawyer. |

## CAST OF CHARACTERS

**KATHLEEN JOHN** – Hired as Per Diem Supervisor in mid 2003; promoted to Assistant Director of Nursing in 2        and Associate Director of nursing in      .

- Masters Degree in Nursing – Nurse Practitioner
- 46 – Married, husband lives in Trinidad and Tobago
- Very intelligent, produces high quality/standard work, quiet individual

Can testify to:
- Accusation and investigation conducted by John McKeon in 2007 regarding our relationship and her "double dipping";
- E-mails sent out by Christine Kay.

**JILLIAN JOHN** – Hired as CNA and promoted to staffing clerk in November 2002 and then to Staffing Manager in April 2008.

- 30's, single mother with two children.
- Took her job very seriously, excellent worker; would work many long hours to ensure that the job was completed.
- Jovial person, outspoken, quick learner.

Can testify to:
- E-mails sent out by Christine Kay;
- Meeting with Mr. McKeon on August 12, 2009.
- The entire situation.

**MICHELLE EDWARDS (Black)** – Hired as Associate Administrator March 2003.

- 40's, married with 2 children
- Masters degree in Health Administration
- Works hard, knows her job, and performs well.
- Concerned about her job security.

She will not be willing to testify although she has verbalized to me her displeasure regarding the only white promotions to AVPs and VPs.



## U.S. Equal Employment Opportunity Commission
### New York District Office

33 Whitehall Street
5th Floor
New York, NY 10004
(212) 336-3620
TDD: 1-800-669-6820
FAX (212) 336-3625
1-800-669-4000

Respondent: KINGSBROOK JEWISH MEDICAL CTR - RUTLAND NURSING HOME
EEOC Charge No.: 520-2010-02287
FEPA Charge No.:

May 24, 2010

Michael J. Borelli
Borelli & Associates, PLLC
One Old Country Road, Suite 347
Carle Place, NY 11514

Dear Mr. Borelli:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

[ X ]  Title VII of the Civil Rights Act of 1964 (Title VII)
[ ]    The Age Discrimination in Employment Act (ADEA)
[ ]    The Americans with Disabilities Act (ADA)
[ ]    The Equal Pay Act (EPA)
[ ]    The Genetic Information Nondiscrimination Act (GINA)

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge has been sent to the respondent as required by our procedures.

[X]    Please be aware that we will send a copy of the charge to the agency listed below as required by our procedures. If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official. Then the agency will investigate and resolve the charge under their statute. If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding. To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case. Otherwise, we will generally adopt the agency's finding as EEOC's.

New York State Division Of Human Rights
Federal Contract Unit
One Fordham Plaza, 4 Fl.
Bronx, NY 10458

While the charge is pending, this office should be notified of any change in your client's address, or where they can be reached if they have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

MH

Michael Huber
Investigator
(212) 336-3766

Office Hours: Monday – Friday, 8:30 a.m. - 5:00 p.m.
www.eeoc.gov

Enclosure(s)

cc:  Gemma Moore
     723 William Street
     Baldwin, NY 11510

I

RECEIVED
MAY 1 1 2010
EEOC-NYDO-CRTIU

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ✔ EEOC | 520-2010-02257 |

_____ and EEOC
State or local Agency, if any

| NAME(Indicate Mr., Mrs., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Gemma Moore | (646) 924-7554 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 723 William Street | Baldwin, NY 11510 | 4/11/1960 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Kingsbrook Jewish Medical Center / Rutland Nursing Home | 15+ | (718) 604-5000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 585 Schenectady Avenue | Brooklyn, NY 11203 | Kings |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | Kings |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ AGE

☒ RETALIATION   ☒ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA): July, 2007

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Please See Appendix A: GEMMA MOORE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | I declare under penalty of perjury that the foregoing is true and correct. |
|---|---|
| I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT | |
| | Date _5/6/10_   Charging Party (Signature) |
| SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) | |

EEOC FORM 5 (10/94)

NOTARY - (When necessary to meet State and Local Requirements)

ERIC ZEV REIMER
NOTARY
PUBLIC
NO. 02RE6273380
QUALIFIED IN NEW YORK COUNTY
COMM. EXP. 01/10/2014

**Appendix A:**

**GEMMA MOORE**

1.   Complainant, Gemma Moore, African American female, is an emigrant from Tobago ("Ms. Moore").  She worked at Kingsbrook Jewish Medical Center ("Kingsbrook") for approximately six and one half (6 ½) years.

2.   Ms. Moore was hired in or about February 2003 to work in a management capacity as the Director of Nursing Services at the Rutland Nursing Home ("Rutland"), a long and short-term care facility on the Kingsbrook campus.

3.   Ms. Moore was an exemplary employee who consistently received compliments and praise from the facility's management and from her coworkers.    She loved her job and actively supported the mission of Kingsbrook and Rutland, and consistently received outstanding annual Performance Evaluations by her supervisors.

4.   Kingsbrook employs 15 or more employees, and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

5.   Rutland, a part of the Kingsbrook institution, also employs 15 or more employees, and is an employer within the meaning of Title VII.

6.   This Charge will delineate the odious treatment to which Kingsbrook and Rutland, by and through their employees, have subjected Ms. Moore.  Ms. Moore is a manager at Rutland who has herself suffered discrimination and retaliation based on her being an African American from the Caribbean.  She has also especially aroused the ire of Kingsbrook and Rutland because she is a Rutland manager who would not abide management decisions or "tow the party line" when it came to their pattern of discriminatory policies and practices.

7.   Kingsbrook's 2008 Table of Organization describes the facility's management hierarchy; it describes 20 different positions, and the individuals who hold them.  These positions include all of Kingsbrook's Assistant Vice Presidents, Vice Presidents, Directors, Counsels, the Executive Vice President, and the President and Chief Executive Officer of Kingsbrook.   The Corporate Compliance Officer, Bonita Hardwick, Esq., is the only African American that holds a position in the Kingsbrook's 2008 Table of Organization.  There is no African American Assistant Vice President, Vice President or Director.

2

8.     Ms. Moore has been subjected to a hostile work environment, most obviously by and through Christine Kay, Director of Long Term Care Resources, Caucasian female ("Kay"), Mary Anne Rose, Vice President of Long Term Care, Caucasian female ("Rose"), and John McKeon, Vice President Human Resources, Caucasian male ("McKeon").

9.     Eventually, Ms. Moore was constructively terminated owing to racism and in retaliation for Ms. Moore's decision to oppose the discrimination and retaliation that was being perpetrated against other Kingsbrook employees.

10.    Ms. Moore was in a unique position as the Director of Nursing Services to appreciate the discrimination that was taking place at Kingsbrook and Rutland, and to stand up on her own behalf, and on behalf of other employees who reported to her. Rather than stay silent, Ms. Moore spoke out repeatedly about her employer's shoddy treatment of its African American employees.

11.    This is the rare case of an employee in a management position arguing that there is discrimination and retaliation taking place and standing up against it, and the EEOC ought to especially scrutinize Kingsbrook and Rutland with regards their treatment of her and several other employees who have themselves filed EEOC charges against Kingsbrook and Rutland, as delineated below.

12.    Before describing the treatment to which Ms. Moore was subjected, it behooves the EEOC to realize some of Ms. Moore's accomplishments during her tenure at Kingsbrook and Rutland.

A. Ms. Moore helped decrease the facility's nosocomial pressure ulcer rate by almost 50% over the past five (5) years.

B. She helped the nursing department in its success at securing successful evaluations in the New York State Department of Health and Joint Commission on the Accreditation of Health Care Organization surveys.

C. She maintained the department's annual budget within target.

D. She also worked with the clinical staff to increase revenue and further improve the Quality Measures by maintaining accurate documentation in medical records.

4

13.     Despite her track record, Ms. Moore was treated disparately relative to Kingsbrook and Rutland employees who are Caucasian.

A.     Caucasian employees at Rutland and Kingsbrook received promotions into positions for which Ms. Moore was eligible, but not given. These promotions are by appointment rather than by application. Ms. Moore has a Bachelors degree in Health Administration; she has a Masters degree in Health Administration; she has a sterling employment track record that included time as a practicing nurse as well as management positions - including her terrific employment track record at Rutland. She was well eminently qualified to hold positions higher than the title she had. Despite this, she was never asked to serve as an Assistant Vice President or a Vice President. Since Ms. Moore started working at Rutland, she would have been qualified to fill the positions of Director of Long Term Care Resources at Rutland and Assistant Vice President of Nursing at Kingsbrook. These positions had vacancies during Ms. Moore's tenure, she was eminently qualified to fill either position, but they were assigned to individuals who were not African American.

B.     The discrepancy between Ms. Moore's educational credentials and the educational credentials of several Rutland and Kingsbrook Directors and Vice Presidents who are not African American is striking. Nympha Meindel, Caucasian American, Kingsbrook Vice President, MIS, was made Vice President before she secured her Master's Degree. Kay herself does not have a Master's Degree, and may not even have a bachelor's degree; yet she secured a Rutland Director position in a period of two (2) years from the time she began her employment. Kay quickly and inexplicably received promotions from Administrative Assistant to Administrative Coordinator to the Director of Long Term Care Resources.

C.     In or about July, 2007, Ms. Moore was denied tuition reimbursement by Kingsbrook for coursework that she was completing at Hofstra University. Ms. Moore properly completed and submitted all relevant paperwork and documentation pursuant to a tuition reimbursement program that was active at the facility. Numerous Caucasian employees, including Debbie Rosenbaum, Caucasian female, Director of Dietary, received this tuition reimbursement.

D.     Ms. Moore received only one (1) raise during her long tenure at Kingsbrook, outside of annual adjustments. Other similarly situated Caucasians in management positions received raises more frequently.

5

14.   Ms. Moore's tenure at Kingsbrook became especially difficult once she began opposing the discrimination that was occurring at Kingsbrook, in part, by assisting other Kingsbrook employees who were themselves complaining of racism. For example, Ms. Moore was a zealous advocate for Jillian John, African American female, Certified Nursing Assistant and Staffing Manager ("Ms. John").

15.   As early as 2007, John complained about discriminatory treatment to which she was being subjected based on, *inter alia,* disparate computer access and permission to secure overtime payments above and beyond her salaried position, as was the case for numerous Caucasian employees. John alleged in an email to Human Resources in or about November, 2007, "This act of **segregation** made me feel very humiliated degraded and even **discriminated against** because, even if I was only allowed to have 'view access' [for the computer] only, then I should have been sent to a different training session."

16.   In or about the beginning of 2008, Ms. Moore attempted on several different occasions to prevail on Rose, Kay, McKeon and Earnest Liggins, Human Resources Representative, Black male ("Liggins"), to formally promote Ms. John from Staffing Clerk to Staffing Manager. Ms. John had been covering the Staffing Manager position since in or about October, 2007 and performed in this capacity in an exemplary manner. Rose attempted to block her promotion because of her race. Ms. Moore, who had already witnessed a pattern of discrimination against Ms. John that included micromanagement and regulation of her access to certain software that was requisite to her performance of her job, refused to tolerate this naked discrimination and complained that she felt that Ms. John was being treated discriminatorily due and owing to her being an African American Caribbean and for her complaints of discrimination. Rose, Kay, McKeon, and Liggins were upset that Ms. Moore had stood up for Ms. John. Ms. John has since filed a charge of discrimination with the EEOC based on race, color, and national origin discrimination and retaliation under Charge No. 520-2009-04093.

17.   In or about May 2009, after a diversity in-service at Kingsbrook, Ms. Moore solicited advice from the lawyer, name unknown, who had delivered the lecture. She asked whether a claim of racism was actionable against a company that put white people into the highest positions of power such as Vice President or Assistant Vice President to the exclusion of more qualified African Americans employees. Ms. Moore was referring to the policies and practices at Kingsbrook and Rutland that were discriminatory that she had

witnessed against African America employees.   Liggins overheard this conversation and Kingsbrook has used this incident as grounds to further harass Ms. Moore.

18.  Rose and McKeon's pattern of retaliation extended to include Ms. Moore's son Kyron Moore, who was also a Kingsbrook employee. Shortly after that May 2009 conversation that Liggins overheard between Gemma and the attorney, Joseph Culbert ("Culbert"), a white male who is the Kingsbrook Hospital Security Director, accused Kyron of stealing optical equipment from the Clinic at which he worked in or around early April 2009. Culbert's accusation against Kyron was demonstrably false for several reasons, most notably due to the fact that Kyron was away from his job on a pre-approved vacation during the first two (2) weeks of April 2009.  He was nowhere near the Clinic or Kingsbrook at the time that the equipment was allegedly stolen. Neither did Kyron have a key to the locked office in which the equipment was housed.  Despite this, Kyron's employment was terminated on or about July 7, 2009. Culbert falsely accused Kyron of the theft to illegally discriminate against him, and to harass Ms. Moore due to her having exercised her legal rights to ensure that the their workplace was free of discrimination. Kyron has filed a charge of discrimination with the EEOC for race, national origin discrimination and retaliation under Charge No. 520-2010-01872.

19.  Ms. Moore's fate was finally sunk in or about the late summer of 2009 when she attempted to prevent Kingsbrook and Rutland from illegally terminating employees who had participated in a Susu.

20.  Susu is a money savings plan steeped in African American culture.  In a Susu, participants contribute weekly an equal sum of money from their paychecks to a single rotating designee, such that each participant is paid out their weekly contributions once in a lump sum across a full rotation of the Susu.

21.  Money that the Susu recipient is "paid out" is money that she has paid or will pay across a full rotation of the Susu.

22.  The effect of targeting Susu at Kingsbrook is to single out for termination African American employees to the exclusion of all other races, because Susu participants are almost entirely African American.  Moreover, such a savings plan is entirely legal, and Kingsbrook's fixation on Susu suggests that there is discriminatory animus underpinning their current effort to eradicate Susus.

23. Across August and September of 2009, Kingsbrook and Rutland undertook an aggressive investigation of Susu in which they were attempting to get Kingsbrook and Rutland employees to "rat out" other Susu participants. John, as well as Janet Hunt, Certified Nursing Assistant, African American female ("Hunt"), were ensnared in this witch-hunt and terminated in violation of the law. Hunt has also filed a charge of discrimination with the EEOC for race, color, and national origin discrimination under Charge No. 520-2010-01984.

24. In or about the end of August, 2009, McKeon, Rose and Moore conversed on several occasions regarding John's participation in the Susu, and McKeon stated to her that it was improper of her to have sided with John in Kingsbrook's attempt to terminate her for participation in a Susu.

25. As she was the Director of Nursing Service, Moore was directly involved in McKeon and Rose's deliberations of Ms. John's fate. Although the ultimate decision was made by McKeon and Rose, Ms. Moore vociferously objected to terminating one of her terrific employees for engaging in a legal activity without so much as a verbal or written warning preceding her firing.

26. McKeon asked Ms. Moore, "**Why are you taking this stand?**" Ms. Moore flat out stated to McKeon that the charges that were being leveled against Ms. John were discriminatory, and that she thought that there was a conspiracy to get Ms. John and all of her associates fired.

27. On or about October 29, 2009, Moore submitted an affidavit on behalf of the EEOC charge filed by John.

28. Since that time, Kingsbrook attempted to secure Moore's resignation. It offered her a small severance in exchange for a waiver of her rights to sue for the discrimination that was and is being perpetrated against her and her coworkers. Ms. Moore refused this offer, and was constructively terminated by Kingsbrook and Rutland. Ms. Moore graciously continued to work on behalf of the employer until the New York State Department of Health and Joint Commission on the Accreditation of Health Care Organization inspection. She was forced out of her job and had to accept a lesser job with an onerous commute. Where it used to take her five (5) minutes to go to work from her home, it can now take upwards of an hour. She makes substantially less annually in her new position.

29. Ms. Moore finds herself in this unfortunate circumstance because of the racism that was being perpetrated by her employer and against her and her

reports and family members, and her principled decision to fight the management of Rutland and Kingsbrook from within.

30.    Based on the foregoing, Kingsbrook and Rutland subjected Ms. Moore to illegal discrimination based on race and national origin, as well retaliation due to her having exercised her legal rights to ensure that their workplace was free of discrimination, in violation of Title VII, as well as all applicable state and local provisions that can be inferred from the facts set forth herein, and to illegal retaliation in violation Title VII.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

GEMMA MOORE

Notary Public

Sworn to and subscribed before me this ___ day of ___, 2010.

# Prohibited Workplace Harassment

**Presented by:**

## Steven M. Berlin, Esq.
**Partner and Chair of Employment
and Labor Law Practice Group
Martin Clearwater & Bell LLP
220 East 42nd Street
New York, NY 10017
212-916-0920
berlis@mcblaw.com
www.mcblaw.com**

for

## KINGSBROOK JEWISH MEDICAL CENTER

**May 26, 2009**

MARTIN CLEARWATER AND BELL LLP
© Copyright 2009

Workplace Harassment
Presented by
Steven M. Berlin, Esq.
Martin Clearwater & Bell LLP

# BRIEF SUMMARY OF THE LAW OF WORKPLACE HARASSMENT

Workplace harassment is a form of discrimination which is a violation of Title VII of the Federal Civil Acts Rights of 1964 and the New York City and State Human Rights Law, as well as the laws of many other counties and cities in the state.   In essence, the laws prohibit any form of harassment based upon an individual's protected classification (i.e., sex, race, disability, etc.).   The most prevalent form of harassment in the workplace is sexual harassment.   The law has developed to generally recognize two types of workplace harassment: "Quid Pro Quo," and "Hostile work environment." Quid Pro Quo is specific to sexual harassment.

Employers should be diligent when it comes to avoiding prohibited workplace harassment.   Prevention is the best tool to eliminate harassment in the workplace.

## LAWS AFFECTING WORKPLACE HARASSMENT

### Major Fair Employment Statutes

- Protect employees from discrimination on the basis of certain protected classes, such as race, age, gender and religion

  - Issued by the US, State, and local governments

  - Prohibited harassment is a form of discrimination.

- *Title VII of the US Civil Rights Act of 1964*

  - Prohibits employment discrimination based on race, color, religion, sex, or national origin.

- *US Age Discrimination in Employment Act*

  - Protects individuals who are 40 years of age or older.

- *Americans with Disabilities Act*

  - Prohibits employment discrimination based on an actual or perceived disability, a record of disability or a relationship or association with an individual with a disability.

- *New York State Human Rights Law*

2         MARTIN CLEARWATER AND BELL LLP
© Copyright 2009

Workplace Harassment
Presented by
Steven M. Berlin, Esq.
Martin Clearwater & Bell LLP

> ■prohibits employment discrimination based on age, race, creed, religion, color, national origin, sex, sexual orientation, disability, military status, genetic predisposition or carrier status,  or marital status.
>
> ■Sexual orientation means heterosexuality, homosexuality bisexuality or asexuality, whether actual or perceived.

■*New York City Human Rights Law*

> ■prohibits discrimination in employment, based on race, color, creed, religion, age, national origin, alienage or citizenship status, gender or sex, sexual orientation, disability, marital status, and partnership status.
>
> ■Gender includes **gender identity** and **sexual harassment**.

■Under these fair employment laws it is illegal to discriminate against on the basis of an employee's protected characteristics in any aspect of employment, including:

> ■hiring and firing;
> ■compensation, assignment, or classification of employees;
> ■transfer, promotion, layoff, or recall;
> ■job advertisements;
> ■recruitment;
> ■testing;
> ■use of Employer facilities;
> ■training and apprenticeship programs;
> ■fringe benefits;
> ■pay, retirement plans, and disability leave; or
> ■other terms and conditions of employment

## Prohibited Harassment

■Form of unlawful discrimination

■Recognized by courts when based on a "protected category".

■Most publicity and law on sexual harassment

■Two types of prohibited harassment:

> ■*Quid Pro Quo*
>
> > ■Involves a tangible or economic consequence of submission to or rejection of a sexual advance.

MARTIN CLEARWATER AND BELL LLP
© Copyright 2009

Workplace Harassment
Presented by
Steven M. Berlin, Esq.
Martin Clearwater & Bell LLP

■Literally means *"this for that"*

■**Hostile Work Environment**:  whether the conduct unreasonably interfered with an individual's work performance or created an intimidating, hostile or offensive work environment.

■*Discriminatory conduct*: it occurred because of victim's membership in protected group such as race, national origin, religion

■*Which has the purpose or effect of*

■unreasonably interfering with an individual's work performance or

■creating an intimidating, hostile or offensive work environment

■*Severe or Pervasive*
**(Not needed under NYC Human Rights law)**

■*Reasonable Person* (or same protected category reasonable person) Standard –
Would a reasonable person find this conduct offensive?
■Would you do or say the same thing in the same way to a member of the subject protected category?

■Would you want the same thing said (in the same tone, inflection, etc.) or done to your spouse, child or parent in their workplace?

■**For all prohibited harassment**

■The harasser can be the victim's supervisor, an agent of the employer, a supervisor in another area, a co-worker, or a non-employer, i.e. a voluntary attending physician, a vendor or patient

■The victim does not have to be the person harassed but could be anyone affected by the offensive conduct

■Unlawful harassment may occur without economic or other injury to or discharge of the victim

■**The harasser may be individually liable**

■Employees are protected from retaliation if

4        MARTIN CLEARWATER AND BELL LLP
© Copyright 2009

Workplace Harassment
Presented by
Steven M. Berlin, Esq.
Martin Clearwater & Bell LLP

- They complain or file a charge of discrimination
- Participate in a discrimination proceeding

- Otherwise opposed discrimination

# Guidelines to Avoid Prohibited Harassment

- Establish, disseminate and enforce an anti-harassment policy

- Enact an effective complaint procedure

- Training

- Discipline—take prompt and effective remedial action—failure to do so can give rise to the existence or continuation of hostile work environment

MARTIN CLEARWATER AND BELL LLP
© Copyright 2009

# MARTIN CLEARWATER & BELL LLP

## Steven M. Berlin



| Phone | (973) 735-0579 |
|---|---|
| | (212) 916-0920 |
| Fax | (973) 735-0584 |
| | (212) 949-7054 |
| E-Mail | berlis@mcblaw.com |



Steven M. Berlin, head of Martin Clearwater & Bell LLP's Employment & Labor Law Practice Group, is an experienced litigator who has represented clients in a wide-range of employment law matters for over 25 years. Mr. Berlin is also a member of the Firm's Physician Practice Group and Commercial Litigation Group.

Mr. Berlin regularly counsels clients, defends claims and prepares contracts and policies involving a full range of employment issues. These include restrictive covenants, executive compensation, wrongful discharge, sexual harassment, age, disability, gender, sexual orientation and racial discrimination, as well as compliance with federal, state and local fair employment and labor laws such as Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Fair Labor Standards Act, ERISA, the Family and Medical Leave Act, the New York Human Rights and Labor Laws and Law Against Discrimination and Labor Laws. He also represents clients in a wide range of business litigation matters.

Mr. Berlin is AV rated by Martindale Hubbell.* He is a speaker at many labor and employment law related seminars, including programs for Lorman Education Services and the New Jersey Institute of Continuing Legal Education. Mr. Berlin has written for several publications, including those in the *New York Law Journal* ("Court Partially Shuts Door to Age Discrimination in New York"), *New Jersey Labor and Employment Law Quarterly* ("Court Awards and Settlement Payments - Income Inclusion, Employment Tax and Reporting Issues", "Counsel Fee Awards and Contingent Attorneys Fee Portions of Awards – Will Taxes Swallow the Award?") and is a contributing author for the new Matthew Bender Employment Litigation in New Jersey treatise. Mr. Berlin has been consecutively named a New Jersey "Super Lawyer" since 2005; a designation given to the top five percent of attorneys in the state each year.

Mr. Berlin earned his B.S. from the University of Maryland at College Park in 1977 and his J.D. from Brooklyn Law School in 1980. He is a member of the Labor and Employment Committee of the Litigation Section of the American Bar Association and has served as chair of its Programming Subcommittee. He is a member of the editorial board of the *New Jersey Labor and Employment Law Quarterly* for the New Jersey Bar Association. Mr. Berlin is the Legislative co-chair of the Garden State Council of SHRM and President of the HRMA of Princeton. He is also a member of the American Health Lawyers Association and the New Jersey Medical Group Management Association. Prior to joining MCB, Mr. Berlin was a Shareholder of Buchanan Ingersoll PC where he headed the Firm's New York and New Jersey Labor and Employment Law Group. He is admitted to practice before both the New York and New Jersey State and Federal Courts and is a New Jersey Certified Civil Trial Attorney.

In addition to his legal expertise, Mr. Berlin is active in community affairs. He currently serves on the board of directors for the IEP Foundation for Youth Services and the Marlboro Jewish Center in Monmouth County.

*CV, BV and AV are registered certification marks of Reed Elsevier Properties Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies.

# EXPERIENCE     RESPONSIVENESS     RESULTS

# GENERAL RELEASE, COVENANT NOT TO SUE
## AND STIPULATION OF CONFIDENTIALITY

1.      In consideration of the payments by Kingsbrook Jewish Medical Center ("Kingsbrook") and other remuneration as set forth more particularly herein, the receipt and sufficiency of which is hereby acknowledged, I, Gemma Moore ("I" or "Releasor"), on behalf of myself and my heirs, executors, administrators, successors and assigns, irrevocably and unconditionally release and discharge Kingsbrook and Rutland Nursing Home, their past and present officers, directors, trustees, agents, owners, shareholders, members, representatives, employees, agents, parents, subsidiaries, successors and assigns (hereinafter collectively referred to as "Releasees"), jointly and individually, from any and all actions, causes of action, obligations, liabilities, judgments, suits, debts, attorneys' fees, costs, sums of money, accounts, options, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, extents, executions, claims and demands whatsoever in law or in equity, which I ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the date of this General Release, Covenant Not to Sue and Stipulation of Confidentiality ("Release Agreement").

*Such claims released include, without limitation, any claims of discrimination on the basis of sex, sexual harassment, disability, handicap, race, racial harassment, color, religion, creed, national origin, ancestry, age, including, without limitation, any right or claims under the New York State Human Rights Law, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Fair Labor Standards Act, the New York Labor Law, or under any other federal, state or local law, rule, regulation or executive order, and any claims of wrongful discharge or termination, breach of contract, written or oral, express or implied, breach of promise, public policy, negligence, whistleblower activities, retaliation, defamation, impairment of economic opportunity, loss of business opportunity, fraud, misrepresentation, disability, perceived disability, history of disability and payment of wages, commissions, overrides, vacation pay, sick pay or any other employment benefits, including claims under the Employee Retirement Income Security Act of 1974, or any claims for attorneys' fees or costs. Nothing in this Paragraph 1 is intended to or constitutes a waiver of any rights I may have under this Release Agreement.*

2.      I hereby acknowledge that my employment with Kingsbrook Jewish Medical Center ceased effective January 4th, 2010. As of that date I will relinquish all titles and designations, will cease performing any work for or on behalf of Kingsbrook (except as otherwise provided herein), and will not hold myself out as an employee, agent or representative of Kingsbrook or Rutland Nursing Home for any purpose whatsoever. I also affirmatively represent that, on or before the close of business on December 31ˢᵗ, 2009, I returned to Kingsbrook any and all properties of any type, including but not limited to, books, records, reports, papers, lists, pagers, cellular phones.

3.      It is further agreed and understood that a material condition of this Release Agreement is my agreement to keep the terms and amount of this Release Agreement in the strictest confidence, and I agree that neither I nor my attorneys will disclose any information concerning the terms and amounts paid to me under this Release Agreement to anyone, including, but not limited to, any past, present or future employees of Kingsbrook. I further covenant and agree that I have not and will not engage in any conduct that is injurious to Releasees' reputation or interest, including but not limited to (i) divulging, communicating, or in any way making use of any confidential information, trade secrets or other proprietary information acquired in the performance of my duties for any Releasee; and (ii) making any communication (whether verbal, written or otherwise) that publicly or privately disparages, criticizes or otherwise reflects adversely on Releasees, or which induces or encourages others to disparage, criticize or take adverse action against Releasees. Nothing contained herein shall be deemed to prohibit me

from testifying truthfully under oath pursuant to any lawful court order or subpoena or otherwise responding to or providing disclosures required by law. In the event that I have disparage or have disparaged any Releasee, it will be considered a material breach of this Agreement, and such Releasee may bring appropriate enforcement, injunctive, and or other proceedings (including contempt proceedings) against me.

4.      You further agree that you will cooperate with Kingsbrook in connection with any existing or anticipated litigation involving Kingsbrook, whether administrative, civil or criminal in nature, and in connection with Kingsbrook's response to any existing or anticipated government inquiries or investigations, to the fullest extent that Kingsbrook reasonably deems your cooperation necessary. The cooperation shall include, but shall not be limited to: 1) providing Kingsbrook any documents in your possession, custody or control; 2) assisting Kingsbrook in obtaining any documents in the possession, custody or control of third parties; 3) making yourself available upon reasonable notice to be interviewed by representatives of Kingsbrook or deposed in connection with any existing or anticipated litigation or governmental inquiries, and to be fully candid, truthful and forthcoming in any such interview or deposition; and 4) assisting Kingsbrook in obtaining the cooperation of others.

5.      I understand and agree that, in consideration for my execution of this Release Agreement and the other covenants and promises made herein, Kingsbrook agrees to the following:

   a.    Severance Pay: Kingsbrook will pay me ten (10) weeks severance pay less all payroll deductions and withholdings as required by law.  Said payments will be made in a lump-sum after Kingsbrook receives this executed Release Agreement I understand and agree that if I participated in Kingsbrook's tax-deferred annuity plan, Kingsbrook will continue to deduct my contributions in the percentage and amounts indicated in the forms I have completed and submitted to Kingsbrook for this purpose.   I further understand that Kingsbrook does not have, and will not have, any obligation to make any contributions to this plan on my behalf.

*Notwithstanding the above, in the event that this Release Agreement is not fully executed or the Release Agreement is revoked by me within seven (7) days of signing, the benefit under Paragraph 6 will not be paid.*

6.      Except as set forth in this Release Agreement, I expressly agree and understand That Kingsbrook does not have, and will not have, any obligation to provide me at any time in the future with any payments, benefits or considerations other than those recited in Paragraph 4 hereof.

7.      I acknowledge and agree that the consideration set forth in this Release Agreement is in addition to anything of value to which I am otherwise entitled by law and/or Kingsbrook policy. Furthermore, I understand that vacation, holiday and personal time accruals ceased on January 4th, 2010.

8.      I acknowledge and agree that, by signing this Release Agreement, I am surrendering and giving up any rights I have or may have, without limiting the generality of any other provision herein:

   a.    To assert any claim against or involving the Releasees arising from or in any way relating to my employment with Kingsbrook and/or the cessation of said employment, or to permit myself to be a member of any class seeking relief against Kingsbrook or the Releasees.  I further agree that, except as may

otherwise be required by law, I will not counsel, voluntarily appear as a witness, voluntarily provide documents or information, or otherwise assist in the prosecution of any claims, class action or otherwise against Kingsbrook or the Releasees.

b.    I further acknowledge and agree that my breach of any of the provisions of this Paragraph 8 shall require me to immediately forfeit and return ("tender back") to Kingsbrook the net amounts set forth in Paragraph 4 above. I further agree that if I initiate an action for any claim released by this Release Agreement, I shall indemnify Kingsbrook for its reasonable costs and attorneys' fees expended in defending such action.

9.    In response to requests for references from prospective employers, Kingsbrook agrees to provide with a positive reference, i.e., dates of employment, last job title held, and last salary earned. I understand that all requests will be directed to John McKeon, Vice-President of Human Resources, or Mary Anne Rose, the Vice-President of Long Term Care.

10.    It is further agreed and understood that nothing contained in this Release Agreement, nor the fact that Kingsbrook has paid me any remuneration under it, shall be considered or deemed to be an admission of any wrongdoing or violation or breach of any federal, state or municipal law, statute, ordinance or executive order or of any duty owed to me by Kingsbrook and/or by any of the Releasees.

11.    By signing this Release Agreement, I acknowledge and agree that:

a.    I have been afforded a reasonable and sufficient period of time to review this Release Agreement for deliberation hereon and for negotiation of the terms herein, and I have been specifically urged by Kingsbrook to consult with legal counsel or a representative of my choice before signing it;

b.    I have carefully read and understand the terms of this Release Agreement, all of which have been fully explained to me;

c.    I have signed this Release Agreement freely and voluntarily and without duress or coercion and with full knowledge of its significance and consequences and of the rights relinquished, surrendered, released and discharged hereunder;

d.    The only consideration for signing this Release Agreement are the terms stated herein and no other promise, agreement or representation of any kind has been made to me by any person or entity whatsoever to cause me to sign this Release Agreement; and

e.    I was offered a minimum period of at least twenty-one (21) days after my receipt of this General Release, Covenant Not to Sue and Stipulation of Confidentiality to review it, but that I specifically requested that such minimum period be waived because I did not wish to wait the full twenty-one (21) days, and that such request and waiver were initiated solely by me, were voluntary on my part and were without any duress or coercion of any kind.

12.    I acknowledge and understand that this General Release, Covenant Not to Sue and Stipulation of Confidentiality may be revoked by me in writing at any time during the period of seven (7) calendar days following the date of my execution of the Release Agreement by delivering such written revocation to John McKeon, Vice President, Human Resources, Kingsbrook Jewish Medical Center, at 585 Schenectady Avenue, Brooklyn, New York 11203. If

such seven (7) day revocation period expires without me exercising my revocation rights, the obligation of this Release Agreement will then become fully effective.

13.      The invalidity of any provision of this Release Agreement shall not affect the validity of any other provision hereof.

14.      I acknowledge and agree that this Release Agreement reflects the entire agreement reached between the parties. There is no other agreement except as stated herein. This Release Agreement shall at all times be construed and governed by the laws of the State of New York without regard to conflicts of laws principles. It may not be changed unless the change is in writing and signed by all parties.

IN WITNESS WHEREOF, _____ has caused this General Release, Covenant

Not to Sue and Stipulation of Confidentiality to be executed on the _____ day of

_____, 2010.

                                        _____
                                                Gemma Moore

                                        Sworn to and subscribed before me this

                                        _____ day of _____, 2010

                                        _____
                                                Notary Public



**KINGSBROOK**
JEWISH MEDICAL CENTER

# HUMAN RESOURCES DEPARTMENT

## *Meeting regarding relationship between Gemma Moore and Kathleen John*

<u>Date:</u>   August 14, 2007

<u>Time:</u>   1:30pm – 2:15pm

<u>Place:</u>   Leviton Room 319 (John McKeon's office)

<u>Details:</u>

In the presence of John McKeon, V.P., Human Resources and Tonya Richards, Employee & Labor Relations Manager, Gemma Moore, Director of Long Term Care Nursing and Kathleen John, Associate Director of Long Term Care Nursing both attested that they are not in violation of the medical center's *Nepotism* and/or *Conflict of Interest* policies because they are not related to each other by blood or marriage.

Kathleen John further attested that since the term of her employment at Kingsbrook Jewish Medical Center, she has never left the facility while on duty to complete assignment(s) for a concurrent employer.

<u>Written by:</u>   JOHN McKEON

<u>Signature:</u>

<u>Date:</u>   8/14/07

Cc:   Personnel file



# KINGSBROOK
### JEWISH MEDICAL CENTER

## CORPORATE COMPLIANCE OFFICE
## MEMORANDUM

**DATE:**          August 29, 2007

**TO:**            Gemma Moore
                   Director of Nursing, RNH

**FROM:**          Bonita J. Hardwick, Esq.
                   Compliance Officer

**SUBJECT:**       **Conflict of Interest Questionnaire Response**

I have reviewed your response to the annual Conflict of Interest
Questionnaire. Question 4 inquires as to whether you have any members
of your immediate family who have engaged in any transaction with
KJMC or RNH during the past year, to which you have responded no.
According to the Department of Human Resources, your sons work for
ATM. Please clarify this issue.

Thank you in advance for your assistance and cooperation.



# KINGSBROOK
**JEWISH MEDICAL CENTER**

# RUTLAND NURSING HOME

DATE:              August 29, 2007

TO:                Bonita J. Hardwick, Esq.
                   Compliance Officer

FROM:              Gemma Moore, RN
                   Director of Nursing Services, RNH

SUBJECT:           Conflict of Interest Questionnaire Response

I always understood ATM to be an "agency" and therefore operate
independently of KJMC and RNH.  I answered "no" to the
question, based on the understanding that my sons were not hired
by KJMC or RNH and therefore did business with ATM.  Last
year when I filled out the questionnaire, I answered no to all the
questions and it was not brought to my attention that this was a
problem.  If this understanding is wrong, then I do apologize for
the misunderstanding.
One of my sons work as a security guard through the agency at one
of the off site clinics and my other son worked through ATM as a
unit clerk for approximately 3-4 weeks.  He has not been assigned
to work at KJMC or RNH since June.

Thank you.



**KINGSBROOK**
JEWISH MEDICAL CENTER

# RUTLAND NURSING HOME

August 29, 2007

Mary Anne Rose
Administrator, RNH
585 Schenectady Avenue
Brooklyn, NY 11203

Dear Mary Anne,
I am writing to let you know that I am feeling very nervous and uncomfortable working at RNH.  As I am writing you this letter, I am in tears.  It could be because I am a very sensitive person, but I feel as if I am being targeted for victimization and discrimination and I do not know why.  Right now, anyone who is close to me and is working at RNH or KJMC is not safe, and would also be targeted for victimization and discrimination just because of their association with me.  I do not know what I have done to deserve this, but everything is being blamed on the union and I do not know how true this is anymore.  I know that I may sound as if I am a paranoid individual, but I never was and still am not. Information that people think is "top secret" is common knowledge.

- I was practically accused by Human Resources of disrespecting the 1199 union, when I left one of their meetings, after being placed in a position where I was ridiculed and cursed at by the Vice President of that union.
- There was the issue of the relationship between Kathleen and myself.
- I was denied my tuition reimbursement for the spring 2007 semester, after being reimbursed $2,250.00 every semester from the fall of 2005.
- There are other incidents that I don't even care to mention.
- And now this. (See attached).

I do not know how much more of this I can take.  I pride myself of being a very strong person, but I have to be wise and know what battles are worth fighting.
I just want to let you know that I am actively seeking another job and I will give you sufficient notice of my separation date when I submit my resignation.
The reason I am letting you know now is to give you enough time to secure another DNS before I actually leave.

I deliberately did not speak to you in person about this because I love and respect you a great deal and I do not know how I could face you to tell you this, so in this regard, I guess I am a coward.
Please try and understand my situation, because I think that my leaving would save the jobs of other innocent people that really need their daily bread.

Respectfully,

Gemma Moore, RN
Director of Nursing Services
Rutland Nursing Home

1

**KINGSBROOK JEWISH MEDICAL CENTER**
**RUTLAND NURSING HOME**

**To:**       **Mary Anne Rose, VP LTC**

**Subject:**    **Nursing Department Goals and Objectives for 2009**

**Preamble:**

I have been the Director of Nursing Services at Rutland Nursing Home for the past six (6) years and during this time I have been face with a lot of challenging situations and had to make a lot of difficult decisions in order to achieve the most important goal of improving the quality of life of the residents at this institution.  In order to go forward, I would like to take this opportunity to list **some of the achievements** of the nursing department from the time of my engagement with the institution to present.

- **Improved staffing and decrease in staff turn over rate**
  - Nurses are now able to go home at the end of their shift without having to be mandated to do another shift due to no relieving staff.
  - There is a significant reduction in the number of complaints related to staffing from the two union bargaining bodies that represent the nursing staff.
  - The staff turn over rate has decreased significantly (by more than 60%) from 2003 to present.
  - CMS 5Star rating for RN is 5 stars.
- **Improvement in staff morale**
  - Meetings held with the staff on a regular basis, thereby giving them the opportunity to voice their concerns and give suggestions that would enhance their working conditions.
  - The staff also has the opportunity to meet with the DNS on a one on one basis to discuss issues without fear of retribution or victimization.
  - There is more staff involvement in decision making in regards to resident care and even in the purchase of equipment that they will be using, therefore giving them that sense of involvement and team work.
  - The staff is also comfortable in coming to the DNS to refer potential employees for hire, knowing that they will be given an opportunity for employment.
  - Recognition of staff caught in the act going above and beyond the call of duty.
  - Recognizing that the staff need a down time and providing an atmosphere for them to unwind and enjoy themselves even when they are at work, by providing entertainment time for them.
  - As part of the disciplinary process, problem solving plays a major role to assist the staff in issues that may affect their work performance, attendance etc.
- **Improvement in the quality of care and life of the residents**
  - The development of the Spa Team which has dramatically enhanced the bathing experience of the residents.
  - The residents appear well groomed on a daily basis.
  - When visiting the clinical units, there is the absence of strong foul odors which is indicative of excellent care.
  - Decrease in the Nosocomial pressure ulcer rate by more than 50%.

- o Investigation of incidents and accidents to ensure that residents are free from abuse, neglect and mistreatment; all self reported cases and hot line calls to the DOH for the past 24 months have resulted in favorable outcomes for the facility.
- o Had a successful 2006 JCAHO survey.
- o Significant progressive improvement in our annual DOH surveys.  Last survey held 2008, only 4 clinical issues cited at a level "D".
- o 5-Star Rating is **4 stars** for overall quality.

- **Improvement in documentation in the medical records**
  - o Emphasized the need for improvement in nursing documentation to the nursing staff, not limited to the following:
    - ➢ Improvement noted in the weekly pressure ulcer flow sheets
    - ➢ Introduction of daily Medicare notes
    - ➢ Q shift notes for all ventilator dependent residents
    - ➢ Monthly Nurses notes
    - ➢ Revised and improved the Nurses Admission Assessment form
    - ➢ Revised and improved the Falls Assessment form
    - ➢ Introduction of Psychotropic Drug Use documentation form
    - ➢ Introduction of CNA Toileting Record that meets DOH standard

- **Enhancement in staff education**
  - o Developed individualized in-service sheets to keep track of the Certified Nursing Assistants annual 12 hour training.
  - o Nursing staff sent to outside seminars geared on improving their delivery of resident care, communication and overall interaction with the residents and family members.
  - o Prepared the MDS Coordinators for the new Medicaid reimbursement process by sending them to seminars specifically focusing on this topic.
  - o Worked collaboratively with Health Dimensions to provide staff with the necessary MDS training needed to maximize our reimbursement.

- **Empowerment of the managerial staff**
  - o Motivated the Clinical Nurse Managers to use modern technology to communicate and prepare reports.
  - o Motivate and encourage managerial staff to be proactive and problem solve, thereby allowing upper management to concentrate on making more upper level decisions.
  - o Involvement of Clinical Nurse Managers in DOH Investigation process.

- **Maintaining a favorable nursing budget**
  - o Completed the PRI process without the use of consultants, thereby decreasing the facility's expenditure and increasing the facility's CMI.
  - o Decrease usage of overtime by introducing innovative ways to decrease the overall number of staff assigned on duty on a daily basis without compromising the quality of care of the residents.

**_Going forward, the goals of the nursing department for the year 2009 are as follows:_**

1. **To continue to maintain a favorable nursing budget** by keeping within our budgetary spending limits.

2. **To increase our revenue and improve our Quality Measures** by maintaining accurate documentation in the medical record with specific focus on our MDS completion, utilizing the EQUIP system to assist us in this endeavor.

3. **To prevent lay offs within the department** by the reorganizing/restructuring of the staff within the department to maximize and capitalize on our current work force and prioritizing revenue.
   - Transfer the full time staffing clerk position to the MDS office and make it a MDS clerk position within the 1199 SEIU labor management.
   - Convert the vacant 0.60 part time Supervisor position to a 0.50 part time "Staffing Associate" position (non-union).  This person will assist the Staffing Manager with data entry and staffing.

4. **To maintain and/or improve on the goals previously attained** that are not relisted.

5. **To lift the professional standard of the nursing department** by empowering the Clinical Nurse Managers, Supervisors, Assistant Head Nurses, and Charge Nurses to lead and manage their staff effectively, and to communicate with each other, residents and family members on a professional level.

6. **To create a more favorable work space for Nursing Administration.**
   - Presently Rutland Nursing Home Nursing Administration has no work area.  The work space that is currently being shared between the Executive Administration and Nursing Administration is too small and cramped and does not allow for any type of privacy/confidentially.  The Director of nursing finds it difficult at times to carry on confidential conversations with her staff and this is becoming more and more uncomfortable.

   I would like the Nursing Administration to have its own suite.  On the third floor, there are a lot of offices that are being utilized by Speech Therapy, which from my observation, most of them are being used to store filing cabinets; also, with the dissolution of the Mental Health Clinic in that same area, the third floor would be the perfect place to put the new Rutland Nursing Home Nursing Administration Suite.
   - In addition to its close proximity to the pediatric unit, it would also be closer to the other clinical areas.
   - We would be able to create a central/common meeting area where nursing would be able to meet with family members, thereby reducing the traffic in DMRI RM101.

This is not an exhaustive list, and as time goes on there may be the need to review, readjust and/or add to the goals as set forth here.  I would be setting up an appointment with the Administrative Coordinator to discuss these goals with you.  Thank you for your attention.

Respectfully submitted by,

Gemma Moore, RN
Director of Nursing Services

# 1199SEIU
## United Healthcare Workers East

RESIDENT
George Gresham

SECRETARY TREASURER
Maria Castaneda

EXECUTIVE VICE-PRESIDENTS
Norma Amsterdam
Yvonne Armstrong
Marshall Blake
Angela Doyle
Mike Fadel
Aida Garcia
Patrick Gaspard
Steve Kramer
Patrick Lindsay
Joyce Neil
John Reid
Bruce Richard
Mike Rifkin
Kay Sackman
Estela Vazquez

VICE-PRESIDENTS AT LARGE
Mark Bergen
Pearl Granat
Vanessa Johnson
Pat Lippold
Andrea Rosenthal
Neva Shillingford
Minerva Solla
Celia Wcislo

VICE-PRESIDENTS
Denise Allegretti
Maryann Allen
Jacqueline Alleyne
Ronnie Babb
Peggy Bachman
Carolyn Brooks
Lisa Brown
Baily Cabral
Gerard Cadet
Ronald Crosswell
Al Davidoff
Armeta Dixon
Enid Eckstein
Mickey Elliott
Jerry Fishbein
Frances Gentle
Larry Ginsburg
Antonio Howell
Anne Jacobs-Moultrie
Keith Joseph
George Kennedy
Maria Kercado
Rosa Lomuscio
Winslow Luna
Koraminita Mahr
Dalton Mayfield
Joanne McCarthy
Robert Moore*
Gerard Nordenberg
Isaac Nortey
Elsie Otero
Jasper Phillips
Bruce Popper
Chadames Rivera
Victor Rivera
John Seales
Rona Shapiro
Allan Sherman
Patricia Smith
Greg Speller
Catherine Taylor
Clare Thompson
Cathy Tucker
Veronica Turner-Biggs
Nelson Valdez
Laurie Vallone
Mary Whitten
Gladys Wrenick

GENERAL COUNSEL
Daniel J. Ratner, Esq.

* Acting VP

**Ms Maryann Rose**
**President Rutland Nursing Home**
**585 Schenectady Avenue**
**Brooklyn NY 11203**
**October 2, 2008**

<u>**Re: Violation of contract / intimidation of 1199SEIU members.**</u>

**Dear Ms. Rose.**

 On or about September 25th 2008 a memo went out to our members from your office under your directive signed by Christine Kay in regards to employees calling out before and after a holiday. Please be advised that you or your agent is in violation of our bargaining agreement including, but not limited to Kingbrook Jewish Medical Center internal policy.
The union's position is that all violations cease and desist immediately
The contract and KJMC policy is clear in the guideline to be followed, such memo if it is in fact a memo, is null and void. We are requesting a meeting with you in an attempt to correct the matter.
You may contact me upon receipt of this letter or within the time frame of our contract, @ 347 256 5119.

Thanks for your cooperation

*Sincerely*
*Lytton Perez*
**Lytton Perez**
**Organizer 1199SEIU**

**CC: Bruce Richard AVP1199SEIU**
    **Elsie Otero VP1199SEIU**
    **Gregory Williams Organizer 1199SEIU**
    **John McKeon VP Human Resources KJMC**
    **Earnest Leggins Director Human Resources KJMC**
    **Stacey Oliver Labor Relation Associate KJMC**
    **Gemma Moore Director of Nursing Rutland Nursing Home**
    **1199SEIU delegates @ KJMC**

**NEW YORK CITY PRINCIPAL HEADQUARTERS**
310 West 43rd St.
New York, NY 10036
(212) 582-1890
www.1199seiu.org

**ALBANY**
155 Washington Ave.
Albany, NY 12210
(518) 396-2300

**KINGSTON**
75 Crown Street
Kingston, NY 12401
(845) 339-1900

**BALTIMORE**
611 North Eutaw Street
Baltimore, MD 21201
(410) 332-1199

**ROCHESTER**
225 W. Broad St., Ste. B
Rochester, NY 14608
(585) 244-0830

**BOSTON**
150 Mt. Vernon Street, 3rd Fl.
Boston, MA 02125
(617) 284-1199

**SYRACUSE**
404 Oak St., Suite 120
Syracuse, NY 13217
(315) 424-1743

**BUFFALO**
974 Kenmore Ave
Buffalo, NY 14216
(716) 982-0540

**UNIONDALE**
50 Charles Lindbergh, Ste. 602
Uniondale, NY 11553
(516) 542-1115

**GOUVERNEUR**
95 E Main St., 2nd Fl.
Gouverneur, NY, 13642
(315) 287-9013

**WHITE PLAINS**
99 Church St.
White Plains, NY 10601
(914) 993-6700



1



**KINGSBROOK**
JEWISH MEDICAL CENTER

# RUTLAND NURSING HOME

October 16, 2008

John McKeon, VP Human Resources
Kingsbrook Jewish Medical Center
585 Schenectady Avenue
Brooklyn, NY 11203

Dear Mr. McKeon,

I have been the Director of Nursing at Rutland Nursing Home for the past five (5) years and eight (8) months.  During this time I have been very instrumental in raising staff morale, gaining their thrust, and creating a favorable work environment, not to mention the fact that there has been a great improvement in the quality of resident care.
As the Director of Nursing, and as outlined in my job description, the Clinical Nurse Managers, Nursing Coordinators, MDS Coordinators, Clinical Reimbursement Coordinator, Registered Nurses, Licensed Practical Nurses, Certified Nursing Assistants, Staffing Manager, Staffing Clerk, nursing Secretary and Associate Director of Nursing are under my direct supervision and therefore reports directly to me.
Recently the position of Director of Long Term Care Resources was appointed, the job description of which is very ambiguous and is now appearing to conflict with the role of the Director of Nursing.

Ms. Kay in her role as Director of Long Term Care Resources monitored staff attendance and provided me with the reports for my review and distribution to the Clinical Nurse Mangers/Nursing Care Coordinators for follow-up.  Ms. Kay following the preparation of the reports formulated and distributed a memo to the Clinical Nurse Managers regarding the disciplines and completion dates.  I addressed the issue of the memo with Ms. Kay, retrieved and reissued the memo coming from me.

On September 11th 2008, an email was sent to Ms. Kathleen John, Associate Director of Nursing, Ms. Mary Anne Rose, VPLTC, Ms. Jillian John, Staffing Manager and myself by Ms. Christine Kay informing us that an issue was discussed in the payroll committee meeting regarding enforcing the option of the Department Head requesting MD notes for employees calling out sick the day before, on or after a holiday.  As per the email Ms. Kay stated that the issue was in the Acute Care and suggested that since it will probably spill over to LTC, she would like to send out a memo regarding enforcing the requirement of the sick note.  Ms. Kathleen John in my absence responded to Ms. Kay's email telling her that a memo of that sort should come from me as the Director of Nursing.  Ms. Kay's response was that since she is the Director of Long Term Care Resources she would send out the memo, implying in her email that directing the nursing

*"We'll earn your trust."*

staff to supply a medical note for sick calls the day before, on or after a holiday fell within her role as the Director of Long Term Care Resources.

When I returned to work and saw the emails, I responded to Ms. Kay letting her know of my displeasure with her sending memos to the nursing staff and reiterating my role as the Director of Nursing. I also informed her that I would be sending out the memo. I proceeded to send out the memo to the nursing staff addressing the issue of sick calls surrounding the holidays and the requirement to provide MD notes.

On September 24-25, 2008, Ms Kay proceeded to send out another memo to all Rutland Nursing Home staff, copied to the Department Heads. The tone of the memo was very demanding and intimidating stating that the employees will not be paid and will receive disciplinary action if they did not adhere to the instructions in the memo.

On Wednesday October 15, 2008 the issue of Ms. Kay's memo was brought up for discussion by the 1199 SEIU, since they themselves appeared to have a problem with such a memo coming from the Director of Long Term care Resources. During the discussion, the union was informed by Ms. Rose, VP of LTC, that she was the one who gave Ms. Kay the authority to send out such a memo. I was very surprised and felt disrespected and humiliated for the reasons that I will numerate:

1. Ms. Rose was copied on all the emails and did not see it fit or necessary to have a conversation or discussion with me regarding Ms. Kay sending out the memo to the staff, especially since she was aware of my perspective on the issue as the Director of Nursing. That did not stop her from discussing the issue with the union in my presence without any regard for me.

2. Ms. Kay's job description as the Director of LTC Resources was not explained to me by Ms. Rose as having shared governance with the Director of Nursing or other Department heads.

3. My understanding was that she would run reports, communicate it to the department heads so that they can direct and manage their staff.

4. It remains unclear to me whether directing Department Heads falls under the role of Ms. Kay as the Director of Long Term Care Resources. It appears as though she is directing the department heads to discipline their staff.

5. My impression is that Human Resources in their own policy has given Department Heads the autonomy to request documentation supporting sick calls as laid out in the policy. Ms. Rose as the VP of LTC, I propose may ultimately direct all staff to provide such supporting documents. My concern is whether that role is now being redirected to the Director of Long Term Care Resources.

6. In addition, the Director of Payroll, whose position I was under the impression was synonymous with, that of Ms. Kay's, just worded differently, does not seem to have the authority to send out memos of this sort. I am certain that Dr. Lederer would not entertain such acts.

7. Let me just point out that as Director of Long Term Care Resources, Ms. Kay does not have the responsibility of directing any personnel but for ensuring that the payroll is accurately completed and to monitor certain processes and run reports for the VP and other Department Heads as requested.

Mr. McKeon, I am bringing this issue to you so that there can be some resolution as to where each role begins and ends. I believe in resolving conflicts, even if it will make me

unpopular.  Please note that this is not a battle over authority but about work ethics.  Dr. Brady is responsibly for the organization as a whole, but she cannot successfully run the organization by herself, hence the different departments with Department Heads that have been awarded the responsibility of ensuring the proper functioning of their departments, which transcends into the successful management of the organization.  The head of HR directs and oversees the HR staff.  The head of Dietary directs and oversees the dietary staff and likewise the head of nursing directs the nursing staff.  Ms. Kay, whose position basically is to manage the payroll, sending a memo to all staff regarding their sick calls, requesting that they provide physician notes, informing them that they would not be paid and receive disciplinary actions against them is synonymous with me or any other department head attempting to direct the staff of another department that does not fall under their domain.  This is just not ethical, and should not be condoned.

I know that your first question would be why I have not attempted to resolve this issue with Ms. Rose.  Ms. Rose was copied on my emails, which clearly stated my disagreement with Ms. Kay sending such a memo to the nursing staff and since there was no communication about the issue from her, I truly believed that the issue was resolved at that point.  However the memo from Ms. Kay did follow (even after I had already sent out a memo to the nursing staff).  In a subsequent meeting with the 1199 SIEU who independently addressed the issue with Ms. Rose, Ms Rose stated that she had authorized the distribution of the memo by Ms. Kay.  This authorization obviously came following the revelation of my perspective on the issue, yet it was not communicated to me, thus it is clear what her views are on this subject.

I said nothing at the labor management meeting because I know ethically it would be wrong to express my views that would have disagreed with Ms. Rose's point of view, and I was not going to engage in that sort of disrespectful behavior, so I have decided to choose this venue to voice my concerns.  I anticipate a speedy resolution to this matter.  Thank you.

(Attached are the e-mails that were communicated among Ms. Christine Kay, Ms. Kathleen John, Ms. Mary Anne Rose and myself and the memo that was sent to the staff by Ms. Kay).

Respectfully,

Gemma Moore, RN
Director of Nursing Services
Rutland Nursing Home

CC:  Mary Anne Rose, VP LTC



# KINGSBROOK
JEWISH MEDICAL CENTER

# RUTLAND NURSING HOME

## MEMORNADUM

Date:        September 25, 2008

To:          All Rutland Nursing Home Employees

From:        Christine Kay *Christine Kay.*
             Director of Long Term Care Resources

RE:          Sick Calls / Miss Swipes

Please be reminded that any employee who calls in Sick the day before, on, or, the day after a KJMC issued Holiday **MUST** submit Medical Proof in order to be paid for the sick day or for the Holiday. If this is not presented immediately upon your return to work you will not be paid.

For nursing employees, the Medical Proof **MUST** be submitted to the Staffing Desk and the Staffing Desk will forward the information to me as the Timekeeper for RNH Nursing employees.

For all other departments the Medical Proof **MUST** be submitted to your Department Head, who will forward it to that Department's Timekeeper.

Please note that no timekeeper can approve the sick time/holiday without the proper documentation.

The KJMC issued Holidays are as follows:
1. New Years Day
2. Martin Luther King
3. Presidents Day
4. Memorial Day
5. 4th of July
6. Labor Day
7. Thanksgiving
8. Christmas

There are no exceptions to this rule.

Also, as per KJMC Policy and Procedure, every employee must swipe in at the beginning of there shift and at the end of there shift. If the time clock rejects your swipe/finger scan, you forgot or lost your ID, or for any other reason you are unable to swipe you **MUST** complete a miss swipe form and have it signed by your Manager/Supervisor and return it to me as quickly as possible. Miss swipes without a miss swipe form will not be paid until the form is completed and signed and brought to me. Miss swipe forms can be found at the Staffing Desk in DMRI 101 or from your Department Head. Please understand that employees who exhibit a pattern for miss swipes will be subject to Disciplinary action.

Thank you.

Cc:     Mary Anne Rose, VP/LTC
        RNH Department Heads
        RNH Mangers/Supervisors
        RNH Timekeepers

**From:** Moore, Gemma
**Sent:** Friday, September 12, 2008 11:20 AM
**To:** Kay, Christine; John, Kathleen; Rose, Mary Anne; John, Jillian
**Subject:** RE: Issue brought up at NYSNA Payroll Committee

Christine,

Any memos going out to the nursing department will come from me. I am ultimately responsible for the nursing department and any problems that arise even in regards to disciplines, I am the one that has to answer as the director of the department. If a problem has to be taken to arbitration, I am the one that has to represent the department. If Mary Anne wants to send the memo out as coming from her, then I know she is the ultimate boss and can do that, even though I know it will be coming from you. I refuse to sit by and have people usurp authority over me. If you and I are running the nursing department together, then I was not informed. You may be responsible for the payroll process, but you are not responsible for my staff. If you have a problem with the nursing department you can communicate it to me and I will take care of it. I am prepared to have HR define my role as the Director of Nursing Services. If the other department heads want you to sent the memo to their staff, then so be it. I refuse to have you send out the memo to my staff. Thank you.

*Gemma B. L Moore*
P- (718) 604-5418
F (718) 604-5622
E-mail: Gmoore@kingsbrook.org

The information in this electronic mail message is privileged and confidential, and intended for the addressee only. It is protected by federal and state law which prohibits you from making any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law. If you are not the intended recipient, the disclosure, copying distribution or use of the contents of this electronic message (including any attachment) is prohibited. If you have received this electronic message in error, please notify the sender immediately and destroy the original message and all copies.

---

**From:** Kay, Christine
**Sent:** Friday, September 12, 2008 7:57 AM
**To:** John, Kathleen; Rose, Mary Anne; Moore, Gemma; John, Jillian
**Subject:** RE: Issue brought up at NYSNA Payroll Committee

Kathleen,

I understand what you are saying but since in my position I am responsible for the overall Payroll process for the Nursing Home, I would send it and send it to all of our departments not just Nursing.

I will begin to draft the memo and submit to Mary Anne for final review.

Thanks,
Chris

**From:** John, Kathleen
**Sent:** Thursday, September 11, 2008 12:33 PM
**To:** Kay, Christine; Rose, Mary Anne; Moore, Gemma; John, Jillian
**Subject:** RE: Issue brought up at NYSNA Payroll Committee

Hi Chris,
As far as I recall in the past we have enforced this MD note requirement for major holidays like the Christmas and New Year. However Ms. Moore is not her today and I think that as the Director of Nursing any memo to be generated to the staff regarding sick note requirements before or after holidays should be generated by her.


*Kathleen John, RN, MSN, FNP*
Associate Director of Nursing Services
Rutland Nursing Home
585 Schenectady Avenue
Brooklyn, NY 11203
PH#  (718) 604-5000 ext. 5260
Fax#  (718) 604-5622
Email: kjohn@kingsbrook.org



The information in this electronic mail message is privileged and confidential, and intended for the addressee only. It is protected by federal and state law which prohibits you from making any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law. If you are not the intended recipient, the disclosure, copying distribution or use of the contents of this electronic message (including any attachment) is prohibited.  If you have received this electronic message in error, please notify the sender immediately and destroy the original message and all copies.



**From:** Kay, Christine
**Sent:** Thursday, September 11, 2008 10:27 AM
**To:** Rose, Mary Anne; Moore, Gemma; John, Kathleen; John, Jillian
**Subject:** Issue brought up at NYSNA Payroll Committee
**Importance:** High

Good morning.

An issue that was brought up at NYSNA Payroll Committee that did not pretain to us during the meeting but I know we are not following:

Employees calling in Sick Before/On/After a Holiday. With Thanksgiving, Christmas and New Years coming up soon.  I want to send a Memo all RNH staff as soon as possible reminding that that if they call sick before/on /after a Holiday they must present an MD note in order to be paid the sick time and the holiday.  This may eliminate the sicks calls around the Holidays.

I will begin to follow the policy effective immediatly when payroll is completed.  I have been doing it but not as effectlivly as I should be.

What do you think?  I could attach the memo to the RNH checks next payroll?

Thanks,
Christine

Christine Kay
Director of LTC Resources
Rutland Nursing Home
(P) 718-604-5949
(F) 718-604-5622

**Moore, Gemma**

| | |
|---|---|
| **From:** | Liggins, Earnest |
| **Sent:** | Tuesday, August 07, 2007 2:26 PM |
| **To:** | Moore, Gemma |
| **Cc:** | John, Kathleen |
| **Subject:** | RE: Issue: Relationship between Gemma Moore and Kathleen John |

The statements are general and attest there is no relationship between you and Ms. John or any other employee for that matter, and you understand the nepotism and conflict of interest policy.

Let me know if you desire to come by today and when so I can be sure to be in the office.


If you need anything further please let me know.

Regards,
Earnest

Earnest Liggins, PHR
Policy and Comm. Manager
Human Resources
"Serving Those Who Serve Our Community"

**From:** Moore, Gemma
**Sent:** Tuesday, August 07, 2007 1:32 PM
**To:** Liggins, Earnest
**Cc:** John, Kathleen
**Subject:** Issue: Relationship between Gemma Moore and Kathleen John

Dear Mr. Liggins,
Can you kindly e-mail to me the questions that you need myself and Ms. John to answer please.
Thank you.

Gemma Moore

Director of Nursing Services
Rutland Nursing Home

8/8/2007

**Moore, Gemma**

| | |
|---|---|
| **From:** | Moore, Gemma |
| **Sent:** | Wednesday, August 08, 2007 3:57 PM |
| **To:** | Rose, Mary Anne |
| **Subject:** | Retension Bonus |
| **Attachments:** | Moore, Gemma.vcf |

Mary Ann,
Can you please update me as to the status of the retension bonus that was promised to me last August (2006)?  Thank you.

Gemma Moore, RN

Director of Nursing Services
Rutland Nursing Home

**Moore, Gemma**

| | |
|---|---|
| **To:** | Liggins, Earnest |
| **Subject:** | Issue: Relationship between Gemma Moore and Kathleen John |
| **Attachments:** | Moore, Gemma.vcf |

Dear Mr. Liggins,
Can you kindly e-mail to me the questions that you need myself and Ms. John to answer please.
Thank you.

Gemma Moore

Director of Nursing Services
Rutland Nursing Home

8/7/2007

## Moore, Gemma

| | |
|---|---|
| **Subject:** | Meeting w/HR, Gemma Moore & Kathleen John re: issue |
| **Location:** | Leviton 319 |
| **Start:** | Wed 6/20/2007 4:00 PM |
| **End:** | Wed 6/20/2007 4:30 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Required Attendees:** | Liggins, Earnest; Moore, Gemma; John, Kathleen; Stewart, Sharon |
| **Importance:** | High |

Due to on-going complaints regarding Moore and John, HR would like to meet with employees today to ultimately resolve issue(s) surrounding relationship.

**Moore, Gemma**

| | |
|---|---|
| **From:** | Moore, Gemma |
| **Sent:** | Wednesday, June 20, 2007 1:05 PM |
| **To:** | Richards, Tonya |
| **Cc:** | Rose, Mary Anne; John, Kathleen |
| **Subject:** | Relationship with Kathleen John |

Dear Tonya,
Re our telephone conversation today in which you requested a meeting with myself and Kathleen John to discuss our relationship (whether or not we are sisters). I need to emphasize in writing as I did via telephone that I have no intention of having a meeting with anyone again to discuss the relationship between myself and Ms. John. I have told Mr. John McKeon in the past and short of providing our birth certificates I have assured him that myself and Ms. John are not related. However, the issue is incessantly being brought up again and again and it seems that my integrity is being wrongfully questioned to the point where I am feeling harassed and victimized. I have seen administrative teams hired at KJMC and their relationships with each other were not questioned, so why am I being targeted? I am a person of high integrity both morally and professionally. I must let you know that this is creating a very uncomfortable working environment and I am demanding that it cease. I intend to have no further discussion with anyone regarding my relationship with Ms. John. I do not intend to sign any document, as requested, that attests to our discussion and the fact that Ms. John and I are not related. If you require any other proof than my spoken words, it will have to be subpoenaed. If KJMC would like to have another DNS and ADNS at Rutland Nursing Home, there are more professional ways to get rid of the current ones, than questioning their integrity.

6/20/2007

## Moore, Gemma

**To:** Liggins, Earnest
**Cc:** Rose, Mary Anne; John, Kathleen
**Subject:** RE: Issue: Relationship between Gemma Moore and Kathleen John
**Attachments:** Moore, Gemma.vcf

I have reviewed the policies on Conflict of Interest and Nepotism, and I have not violated any of them due to the fact that Ms. Kathleen John and I are not related.  Thank you.
Gemma Moore, RN DNS

Director of Nursing Services
Rutland Nursing Home

---

**From:** Liggins, Earnest
**Sent:** Wednesday, August 08, 2007 4:36 PM
**To:** Moore, Gemma
**Subject:** RE: Issue: Relationship between Gemma Moore and Kathleen John

As requested.

Please let us know if you need anything further.


Regards,
Earnest


Earnest Liggins, PHR
Policy and Comm. Manager
Human Resources
"Serving Those Who Serve Our Community"

---

**From:** Moore, Gemma
**Sent:** Wednesday, August 08, 2007 3:52 PM
**To:** Liggins, Earnest
**Subject:** RE: Issue: Relationship between Gemma Moore and Kathleen John

Mr. Liggins,
May I have a copy of these two policies please.  I am unable to get them off the internet.  Thank you.

Ms. Moore, RN

Director of Nursing Services
Rutland Nursing Home

---

**From:** Liggins, Earnest
**Sent:** Tuesday, August 07, 2007 2:26 PM
**To:** Moore, Gemma
**Cc:** John, Kathleen

8/9/2007

**Subject:** RE: Issue: Relationship between Gemma Moore and Kathleen John

The statements are general and attest there is no relationship between you and Ms. John or any other employee for that matter, and you understand the nepotism and conflict of interest policy.

Let me know if you desire to come by today and when so I can be sure to be in the office.


If you need anything further please let me know.

Regards,
Earnest


Earnest Liggins, PHR
Policy and Comm. Manager
Human Resources
"Serving Those Who Serve Our Community"


**From:** Moore, Gemma
**Sent:** Tuesday, August 07, 2007 1:32 PM
**To:** Liggins, Earnest
**Cc:** John, Kathleen
**Subject:** Issue: Relationship between Gemma Moore and Kathleen John

Dear Mr. Liggins,
Can you kindly e-mail to me the questions that you need myself and Ms. John to answer please.
Thank you.

Gemma Moore

Director of Nursing Services
Rutland Nursing Home

8/9/2007

## Moore, Gemma

| | |
|---|---|
| **From:** | Liggins, Earnest |
| **Sent:** | Thursday, August 09, 2007 5:24 PM |
| **To:** | Moore, Gemma |
| **Cc:** | Rose, Mary Anne; John, Kathleen |
| **Subject:** | RE: Issue: Relationship between Gemma Moore and Kathleen John |

Ms. Moore,
    I understand, however, we need to formalize this interaction. Please contact me with an appropriate and convenient before Friday at 5:00PM to conclude this matter.

Regards,
Earnest


-----Original Message-----
From: Moore, Gemma
Sent: Thu 8/9/2007 4:50 PM
To: Liggins, Earnest
Cc: Rose, Mary Anne; John, Kathleen
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John

    I have reviewed the policies on Conflict of Interest and Nepotism, and I have not violated any of them due to the fact that Ms. Kathleen John and I are not related.   Thank you.
Gemma Moore, RN DNS
Director of Nursing Services
Rutland Nursing Home


From: Liggins, Earnest
Sent: Wednesday, August 08, 2007 4:36 PM
To: Moore, Gemma
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John


As requested.


Please let us know if you need anything further.



Regards,

Earnest


Earnest Liggins, PHR

Policy and Comm. Manager

Human Resources

"Serving Those Who Serve Our Community"

---

From: Moore, Gemma
Sent: Wednesday, August 08, 2007 3:52 PM
To: Liggins, Earnest
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John


Mr. Liggins,

May I have a copy of these two policies please.  I am unable to get them off the internet.
Thank you.


Ms. Moore, RN

Director of Nursing Services
Rutland Nursing Home

---

From: Liggins, Earnest
Sent: Tuesday, August 07, 2007 2:26 PM
To: Moore, Gemma
Cc: John, Kathleen
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John

The statements are general and attest there is no relationship between you and Ms. John or
any other employee for that matter, and you understand the nepotism and conflict of
interest policy.


Let me know if you desire to come by today and when so I can be sure to be in the office.



If you need anything further please let me know.


Regards,

Earnest

---

Earnest Liggins, PHR

Policy and Comm. Manager

Human Resources

"Serving Those Who Serve Our Community"

From: Moore, Gemma
Sent: Tuesday, August 07, 2007 1:32 PM
To: Liggins, Earnest
Cc: John, Kathleen
Subject: Issue: Relationship between Gemma Moore and Kathleen John


Dear Mr. Liggins,

Can you kindly e-mail to me the questions that you need myself and Ms. John to answer
please.

Thank you.


Gemma Moore

Director of Nursing Services
Rutland Nursing Home

3

**Moore, Gemma**

| | |
|---|---|
| **To:** | Liggins, Earnest |
| **Cc:** | Rose, Mary Anne; John, Kathleen |
| **Subject:** | RE: Issue: Relationship between Gemma Moore and Kathleen John |

Dear Mr. Liggins,
I need to get a "formal" complaint in writing made against myself and Ms. Kathleen John
that warrants me having to be subjected to an investigation of this type.  I consider
myself to be upper management and if I have to do this, then I need to know that my rights
are not being violated and that I am not the only person going through this proccess
(having to attest to the fact that I am not related to anyone in this institution), since
these policies are in effect for the entire organization.  I am not prepared to meet with
you until I have secured the presence of my legal counsel during this "formal
interaction".

-----Original Message-----
From: Liggins, Earnest
Sent: Thursday, August 09, 2007 5:24 PM
To: Moore, Gemma
Cc: Rose, Mary Anne; John, Kathleen
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John

Ms. Moore,
    I understand, however, we need to formalize this interaction. Please contact me with an
appropriate and convenient before Friday at 5:00PM to conclude this matter.


Regards,
Earnest


-----Original Message-----
From: Moore, Gemma
Sent: Thu 8/9/2007 4:50 PM
To: Liggins, Earnest
Cc: Rose, Mary Anne; John, Kathleen
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John

   I have reviewed the policies on Conflict of Interest and Nepotism, and I have not
violated any of them due to the fact that Ms. Kathleen John and I are not related.   Thank
you.
Gemma Moore, RN DNS
Director of Nursing Services
Rutland Nursing Home


From: Liggins, Earnest
Sent: Wednesday, August 08, 2007 4:36 PM
To: Moore, Gemma
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John


As requested.


Please let us know if you need anything further.

1

Regards,

Earnest

—

Earnest Liggins, PHR

Policy and Comm. Manager

Human Resources

"Serving Those Who Serve Our Community"

_____

From: Moore, Gemma
Sent: Wednesday, August 08, 2007 3:52 PM
To: Liggins, Earnest
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John

Mr. Liggins,

May I have a copy of these two policies please.  I am unable to get them off the internet.
Thank you.

Ms. Moore, RN

Director of Nursing Services
Rutland Nursing Home

_____

From: Liggins, Earnest
Sent: Tuesday, August 07, 2007 2:26 PM
To: Moore, Gemma
Cc: John, Kathleen
Subject: RE: Issue: Relationship between Gemma Moore and Kathleen John

The statements are general and attest there is no relationship between you and Ms. John or
any other employee for that matter, and you understand the nepotism and conflict of
interest policy.

Let me know if you desire to come by today and when so I can be sure to be in the office.

If you need anything further please let me know.

Regards,

2

Earnest

—

Earnest Liggins, PHR

Policy and Comm. Manager

Human Resources

"Serving Those Who Serve Our Community"

---

From: Moore, Gemma
Sent: Tuesday, August 07, 2007 1:32 PM
To: Liggins, Earnest
Cc: John, Kathleen
Subject: Issue: Relationship between Gemma Moore and Kathleen John


Dear Mr. Liggins,

Can you kindly e-mail to me the questions that you need myself and Ms. John to answer please.

Thank you.


Gemma Moore

Director of Nursing Services
Rutland Nursing Home

3

**From:** Moore, Gemma
**Sent:** Friday, September 12, 2008 11:20 AM
**To:** Kay, Christine; John, Kathleen; Rose, Mary Anne; John, Jillian
**Subject:** RE: Issue brought up at NYSNA Payroll Committee

Christine,

Any memos going out to the nursing department will come from me. I am ultimately responsible for the nursing department and any problems that arise even in regards to disciplines, I am the one that has to answer as the director of the department. If a problem has to be taken to arbitration, I am the one that has to represent the department. If Mary Anne wants to send the memo out as coming from her, then I know she is the ultimate boss and can do that, even though I know it will be coming from you. I refuse to sit by and have people usurp authority over me. If you and I are running the nursing department together, then I was not informed. You may be responsible for the payroll process, but you are not responsible for my staff. If you have a problem with the nursing department you can communicate it to me and I will take care of it. I am prepared to have HR define my role as the Director of Nursing Services. If the other department heads want you to sent the memo to their staff, then so be it. I refuse to have you send out the memo to my staff. Thank you.

*Gemma B. L Moore*
P- (718) 604-5418
F (718) 604-5622
E-mail: Gmoore@kingsbrook.org

The information in this electronic mail message is privileged and confidential, and intended for the addressee only. It is protected by federal and state law which prohibits you from making any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law. If you are not the intended recipient, the disclosure, copying distribution or use of the contents of this electronic message (including any attachment) is prohibited. If you have received this electronic message in error, please notify the sender immediately and destroy the original message and all copies.

---

**From:** Kay, Christine
**Sent:** Friday, September 12, 2008 7:57 AM
**To:** John, Kathleen; Rose, Mary Anne; Moore, Gemma; John, Jillian
**Subject:** RE: Issue brought up at NYSNA Payroll Committee

Kathleen,

I understand what you are saying but since in my position I am responsible for the overall Payroll process for the Nursing Home, I would send it and send it to all of our departments not just Nursing.

I will begin to draft the memo and submit to Mary Anne for final review.

Thanks,
Chris

**From:** John, Kathleen
**Sent:** Thursday, September 11, 2008 12:33 PM
**To:** Kay, Christine; Rose, Mary Anne; Moore, Gemma; John, Jillian
**Subject:** RE: Issue brought up at NYSNA Payroll Committee

Hi Chris,
As far as I recall in the past we have enforced this MD note requirement for major holidays like the Christmas and New Year. However Ms. Moore is not her today and I think that as the Director of Nursing any memo to be generated to the staff regarding sick note requirements before or after holidays should be generated by her.


*Kathleen John, RN, MSN, FNP*
Associate Director of Nursing Services
Rutland Nursing Home
585 Schenectady Avenue
Brooklyn, NY 11203
PH#   (718) 604-5000 ext. 5260
Fax#   (718) 604-5622
Email: kjohn@kingsbrook.org



The information in this electronic mail message is privileged and confidential, and intended for the addressee only. It is protected by federal and state law which prohibits you from making any further disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law. If you are not the intended recipient, the disclosure, copying distribution or use of the contents of this electronic message (including any attachment) is prohibited.  If you have received this electronic message in error, please notify the sender immediately and destroy the original message and all copies.


**From:** Kay, Christine
**Sent:** Thursday, September 11, 2008 10:27 AM
**To:** Rose, Mary Anne; Moore, Gemma; John, Kathleen; John, Jillian
**Subject:** Issue brought up at NYSNA Payroll Committee
**Importance:** High

Good morning.

An issue that was brought up at NYSNA Payroll Committee that did not pretain to us during the meeting but I know we are not following:

Employees calling in Sick Before/On/After a Holiday.  With Thanksgiving, Christmas and New Years coming up soon.  I want to send a Memo all RNH staff as soon as possible reminding that that if they call sick before/on /after a Holiday they must present an MD note in order to be paid the sick time and the holiday.  This may eliminate the sicks calls around the Holidays.

I will begin to follow the policy effective immediatly when payroll is completed.  I have been doing it but not as effectlivly as I should be.

What do you think?  I could attach the memo to the RNH checks next payroll?

Thanks,
Christine

Christine Kay
Director of LTC Resources
Rutland Nursing Home
(P) 718-604-5949
(F) 718-604-5622